UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

*FILED*

AUG 13 2014

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | |
|---|---|
| THE RECTOR, WARDENS, AND VESTRYMEN OF CHRIST CHURCH CATHEDRAL OF INDIANAPOLIS, | ) ) ) ) |
| Plaintiff, | ) Cause No.: ) |
| v. | ) ) ) Jury Trial Demanded |
| JPMORGAN CHASE AND COMPANY, and JPMORGAN CHASE BANK, N.A., | ) ) **1 : 1 4 -cv- 1 3 3 1 LJM -MJD** |
| Defendants. | ) ) |

## COMPLAINT

The Rector, Wardens, and Vestrymen of Christ Church Cathedral of Indianapolis, Indiana ("Christ Church" or the "Church"), by and through its undersigned counsel, file this complaint against JPMorgan Chase and Company and JPMorgan Chase Bank, N.A because of their: (a) intentional mismanagement of and self-dealing in trust accounts benefiting Christ Church ("Christ Church Trusts" or "Trusts"); (b) selection of high-risk, high-cost, opaque, unsuitable, and poorly performing investments in order to further their own financial interests to the detriment of Christ Church; (c) fraudulent misrepresentations made to the Church including their self-described "superior" investment management and due diligence prowess, the high quality and performance of their proprietary investment products, and the reasonableness of their fees; (d) omissions of material facts including the presence of widespread and profound conflicts of interests which seriously impacted the Trusts and the substantial exorbitant revenues received by JPMorgan both from the Church Trusts and third-parties related to the Trusts; (e) violations of federal, state, and common law obligations requiring them to adhere to the highest fiduciary standards in managing the Christ Church Trusts; and, (f) the creation of toxic investment

products and funding those products with Christ Church Trusts funds resulting in the surreptitious transfer of wealth from the Christ Church Trusts to JPMorgan.

## THE PARTIES

1.      Plaintiff Christ Church is an Indiana corporation with its principal place of business on Monument Circle, Indianapolis, Indiana.

2.      Defendant JPMorgan Chase and Company is a Delaware corporation with its principal place of business in New York, New York, whose stock is traded on the New York Stock Exchange (NYSE Symbol: "JPM").

3.      Defendant JPMorgan Chase Bank, N.A. is a nationally chartered bank with its principal place of business in Columbus, Ohio.

4.      Defendant JPMorgan Chase and Company owns not only the Defendant national bank but other multiple subsidiaries and affiliates.

5.      Defendant JPMorgan Chase Bank, N.A. and other JPMorgan subsidiaries and affiliates report to their parent bank holding company, Defendant JPMorgan Chase and Company, and all of the revenues of JPMorgan subsidiaries are consolidated with and included in JPMorgan Chase and Company's annual reports to shareholders and federal and state regulatory agencies.

6.      At times herein, Defendant JPMorgan Chase and Company, Defendant JPMorgan Chase Bank, N.A., and multiple JPMorgan subsidiaries and affiliates will be referred to collectively as "JPMorgan."

## JURISDICTION AND VENUE

7.      This Court has jurisdiction of this case pursuant to 28 U.S.C. §§1331 and 1332.

8.      This is a civil action involving a sum in excess of $75,000, exclusive of interest and costs.

2

9.     Venue is proper in the Southern District of Indiana pursuant to 28 U.S.C. § 1391(b).

## FACTS

### Summary

10.     From July 2004 through December 2013, Defendant JPMorgan Chase Bank, N.A. served as the sole trustee over the Christ Church Trusts accounts. During this period, JPMorgan caused the Church Trusts to lose approximately $13 million in value as a result of JPMorgan's decisions to purchase over 177 different investment products, mostly from itself, using Church funds because they produced the highest revenues to JPMorgan, to the detriment of Christ Church.

11.     At the very highest levels of JPMorgan, decisions were made to steer clients to JPMorgan products regardless of the damage which could result to beneficiaries such as Christ Church.   JPMorgan used a "guided architecture" platform whereby it approved financial products because JPMorgan would receive the highest revenues and then it caused its employees to steer JPMorgan clients, including the Church Trusts, to those products.

12.     Most of the financial products found in the Christ Church Trusts' portfolio earned JPMorgan substantial revenues in disclosed and undisclosed fees, expenses, retrocessions (or kickbacks), and revenue sharing payments from third parties seeking to have their products underwritten and approved by JPMorgan in order to gain access to JPMorgan clients and be included in the JPMorgan guided architecture platform of approved investments.

13.     JPMorgan as trustee used millions of dollars of Church funds to purchase from itself clearly unsuitable investments for the Church including private equity funds, structured notes, hedge funds, and other proprietary funds, many of which had no track record of success

and were doomed to fail. The percentage of proprietary products purchased from itself on behalf of the Church ranged from 68% to a staggering 85% of the portfolio.

14.     Between 2004 and 2013, JPMorgan used Church Trusts funds to purchase mostly from itself approximately eighty-eight structured notes where JPMorgan served as the exclusive placement agent, nine offshore hedge conduit or feeder funds created by JPMorgan, two private equity conduit or feeder investments created by JPMorgan, a JPMorgan managed stock account, JPMorgan cash sweep accounts, and multiple other JPMorgan proprietary funds including many that were so heavily burdened with expenses and fees that they were doomed to fail to perform.

15.     In the management of the Christ Church Trusts, JPMorgan dramatically underperformed JPMorgan's own approved policy/custom index for the 1, 2, 3 and 5 year time periods. The policy/custom index is a weighted combination of widely recognized benchmarks that are clearly defined, openly published, and routinely updated by firms such as Russell Investments, Standard and Poor's, and Barclay's Capital.

16.     JPMorgan's performance was even worse when ranked against a universe over time. Universe rankings are commonly used to compare the performance of the client's portfolio against a collection of return data for similar portfolio types, in this case other endowments and foundations. The universe results are collected and updated with data from other portfolios on a quarterly basis. Compared to other endowment and foundation portfolios valued at less than $100 million, for the 1, 2, 3, and 5-year time periods, JPMorgan's universe rankings were 97, 100, 100, and 100, as of December 2012. In this ranking, 1 is the best and 100 is the worst.

17.     During this same period, JPMorgan's disclosed fees exponentially increased. From 2004 through 2013, the annual disclosed fees revealed on the JPMorgan monthly statements increased from an annual average of $35,000 to $177,800, an increase of 475%,

which totaled close to $1 million. This increase in fees was not a result of increasing values of the Church Trusts; to the contrary, fees increased as the value of the Trusts decreased. Further, the affirmatively concealed revenues received by JPMorgan from the use of Trust Funds is expected to be far greater and will render the disclosed fees to be insignificant in comparison.

18. Despite repeated requests from the Church for actual dollars received by JPMorgan from all sources related to the Christ Church Trusts, JPMorgan as trustee has never revealed the total accurate amount of revenues it received based upon JPMorgan's use of Church Trusts funds. Instead, JPMorgan provided only carefully contrived responses relating to limited revenues received by certain, but not all, JPMorgan entities.

19. On many of the financial products purchased by JPMorgan from itself on behalf of the Church using Church funds, JPMorgan made substantially more money than the Church, even though the Church Trusts bore all the risks of the speculative investments.

20. Between 2004 and 2007, the value of the Church Trusts ranged from $35.4 to $39.2 million. After seven and a half years of JPMorgan "management," as of December 2013, the Trust's value decreased to $31.6 million.

21. While the Church has suffered greatly and its portfolio value has declined significantly, JPMorgan has thrived. Between 2004 and 2013, JPMorgan's assets increased from $1 trillion to $2.4 trillion and its net revenues increased from $43 billion to $96.6 billion.

22. Guided architecture involving steering client assets into proprietary products has been immensely profitable to JPMorgan. According to a 2014 firm overview provided to shareholders, JPMorgan earned $1.1 billion in revenues from cross-selling investment products to asset management clients.

23.    As far as the Church knows, there was never a single JPMorgan employee who served as an ombudsman on behalf of the Church, ensuring that the Church Trust Accounts were effectively monitored, properly supervised, and that suitable investments were selected free from any conflict of interests.

## The Background of Christ Church

24.    Christ Church, founded in 1837, is housed in the oldest structure on Monument Circle in Indianapolis, and is listed on the National Register of Historic Places.

25.    Christ Church has a strong commitment to the downtown Indianapolis community.  At one point, many different churches were located around Monument Circle. However, by 1953, Christ Church was the lone church on Monument Circle as other congregations had moved away from downtown.  Its location on Monument Circle makes it uniquely able to serve the needs of the downtown Indianapolis community.

26.    Christ Church has been a leading congregation in Indianapolis for the past 175 years.  Many of the accomplishments of the congregation were made possible by the generosity of the Lilly family.  Eli Lilly, Jr. ("Mr. Lilly") made a significant gift during his lifetime establishing an endowment for Christ Church called the Talbot Fund.  In the deed of gift, he gave his church this charge:

> By virtue of its location in the heart of the City and the State, and its vocation as the last Christian church standing in the downtown district, it should exert a leadership not only in the Episcopal Church, but in the spiritual life of the whole city.

27.    Christ Church has strived to fulfill this vocation and mandate.  Today it is a thriving Episcopal congregation with a diverse membership drawn from all walks of life, from leading citizens of Indianapolis to those struggling to make ends meet.  Yet it is not only a home

for its members, Christ Church is a house of prayer for all people and a church for the City of Indianapolis.

28.    It has been and continues to be an ecumenical and interfaith leader. A century ago, Christ Church founded the Church Federation, ensuring cooperation among the various Christian denominations in Indianapolis. Several years ago, it joined with other congregations to launch the Interfaith Hunger Initiative, drawing together Christian, Jewish, Muslim, Hindu, Buddhist, and Sikh leaders to work cooperatively to end child hunger in Indianapolis.

29.    In addition to religious cooperation, Christ Church has worked toward the welfare and common good of the community. In the early 1800s, it helped initiate public education in Indianapolis. Over the years it has supported and often been among the founders of leading charities and social service agencies, including Gleaners Food Bank, the Julian Center for abused women, Craine House providing alternative sentencing for incarcerated mothers, the Damien Center promoting help for those with HIV or AIDS, the Dayspring Shelter for homeless families, as well as the Children's Bureau, the Coalition for Homelessness Intervention and Prevention, Exodus refugee settlement, Lutheran Child and Families Services, Second Helpings, and many other worthy organizations. Over the past decade Christ Church Cathedral has provided over $10 million toward the support of these and other worthy groups.

30.    The reach of this congregation also extends nationally and internationally. For example, in the past decade, Christ Church gifted $1 million in response to Hurricane Katrina in 2005 and the Haiti earthquake in 2011.

31.    Finally, Christ Church, in keeping with the tradition of Anglican cathedrals, is a leader in the arts, particularly in music. It hosts concerts, recitals, and musical events, and its internationally recognized choirs have toured widely.

## Mr. Lilly's Devotion to Christ Church

32.    Mr. Lilly, born in 1885 in Indianapolis, graduated from Philadelphia College of Pharmacy in 1907. Soon thereafter he began working for his grandfather's company, Eli Lilly and Company, where he eventually became president.

33.    Christ Church was the church of the Lilly family. Mr. Lilly was baptized there in 1885 and was part of the youth choir. In 1927, he became a vestryman and served in that position throughout his life. In 1928, Mr. Lilly and his wife Ruth established the church library. In the 1950s, Mr. Lilly served as a junior warden and was responsible for the parish's property. In 1957, Mr. Lilly authored the book "History of the Little Church on the Circle: Christ Church Parish Indianapolis 1837-1955."

## Mr. Lilly's Will

34.    Mr. Lilly executed his Last Will and Testament ("the Will") on May 29, 1973. (See Exhibit ("Ex. A"), attached hereto.)

35.    Mr. Lilly's Will reflected his dedication to Christ Church and downtown Indianapolis, providing that (after various bequests and payments), ten percent of the remaining estate would be set aside in three trusts for the benefit of Christ Church. He directed that this bequest to Christ Church be divided into three equal shares which were to be managed by three separate trustees - all Indianapolis banks: Indiana National Bank ("INB"), American Fletcher National Bank and Trust Company ("AFNB") and Merchants National Bank & Trust Company of Indianapolis ("Merchants").

36.    Mr. Lilly's Will further provided that income from the three separate Christ Church Trusts would be distributed to Christ Church "for use in the preservation of Christ Church, for ensuring the continuance of Christ Church in its present location on Monument Circle, and generally to assist in carrying on its religious, charitable and educational purposes."

37.   Mr. Lilly died on January 24, 1977.

### The Designation of Indiana Banks as Trustees

38.   In the 1970s, at the time the Will was written, banks were typically appointed as trustees to administer estates, collect and safeguard assets, and distribute testamentary bequests. At the time, banks were prohibited from acting as broker-dealers and investment bankers, did not offer their own financial products other than conservative and transparent investments, and did not have a personal stake or interest in the specific investments made on behalf of the trusts they served.

39.   All three Indiana banks were subject to the Banking Act of 1933 (Pub. L. 73-66), enacted June 16, 1933, including four sections which are commonly referred to as the Glass-Steagall Act, which separated commercial and investment banking. The Glass-Steagall Act restricted commercial banks and their affiliates from underwriting and distributing securities and was enacted by Congress to halt the abuse by banks of selling high risk securities to their customers, in clear conflict of the bank's duties owed to its customers.

### The Disappearance of the Original Indiana Bank Trustees

40.   The three Indianapolis banks selected by Mr. Lilly to serve as trustees no longer exist.

41.   Through a series of bank mergers and consolidations, Defendant JPMorgan Chase Bank N.A. became the Trustee entrusted with the care, management, growth, and preservation of two of the three Christ Church Trusts.[1]

---

[1] The third trust which was initially managed by Merchants National Bank in Indianapolis was acquired by another out-of-state bank. Its trusteeship is not the subject of this lawsuit.

Today, none of the Christ Church Trusts are managed by a bank. In December 2013 and January 2014, the Marion County Probate Court appointed the Christ Church Cathedral Foundation as the Successor Trustee for all of the Christ Church Trusts.

### The Background of JPMorgan

42.     JPMorgan Chase & Company is a multinational banking and financial services holding company.

43.     Per its 2013 Annual Report, JPMorgan has $2.4 trillion in assets and over $211 billion in stockholders' equity.

44.     JPMorgan has three principal subsidiaries in the United States:  (1) Defendant JPMorgan Chase Bank, N.A.; (2) Chase Bank USA, N.A., another national bank that is JPMorgan's credit card-issuing bank; and (3) J.P. Morgan Securities LLC.

45.     There are multiple JPMorgan subsidiaries and affiliates which are identified in investment offerings as receiving fees, commissions, management fees, and profits which include, but are not limited to, revenues received by J.P. Morgan Investment Management, Inc., JPMorgan Asset Management Holdings, Inc., J.P. Morgan Distribution Services, Inc., J.P. Morgan Private Investments, Inc., JPMorgan Clearing Corp.; and, Highbridge Capital Management LLC (a hedge fund wholly owned by JPMorgan).

46.     JPMorgan is organized, for management reporting purposes, into four major business segments:  Consumer & Community Banking, Corporate & Investment Banking, Commercial Banking, and Asset Management.

47.     Asset Management is defined as "the business of providing financial products or services to a third party for a fee or commission."

48.     Asset managers invest on behalf of others and do not put their own capital at risk.

49.     The Asset Management business segment is a critical component in JPMorgan's financial success and the sale of JPMorgan proprietary and affiliated products is responsible for its substantial revenues.  According to JPMorgan's 2013 Annual Report, the substantial losses to

the bank from traditional banking income (including mortgage fees and interest income) were offset by "asset management, administration and commissions revenue."

50.     As JPMorgan reported to its shareholders, its revenues continued to increase through growth in its sales of investment products and receipt of higher performance and investment service fees.

51.     As previously stated, asset managers earn fees and commissions on others' cash and do not have to put their own capital at risk.   JPMorgan took this advantage farther. JPMorgan devised a way to use client funds as "seed" money, i.e. risk capital, to launch new proprietary products.  JPMorgan underwrote and created investment products and then purchased from itself the newly created products with funds belonging to its existing client base, including trust clients who had no ability to veto the selection of the newly underwritten or manufactured product and often did not even know in advance that the product had been purchased on its behalf, such as Christ Church.

### JPMorgan's Duties as Trustee

52.     JPMorgan, as a trustee, assumed the duty to invest and manage the Christ Church Trusts assets solely in the best interests of the beneficiary, Christ Church.

53.     Bank fiduciaries are held to higher standards of care and prudence which underscore the importance for a bank fiduciary to act solely in the best interest of its clients and to create an environment of high ethics and strong risk management processes.

54.     There are multiple reasons why the law imposes a higher duty upon a bank trustee in managing a trust.  The bank trustee is the only one making the management and investment decisions.  Beneficiaries cannot veto decisions made by the bank trustee as to the selection of investment products to be included in the trust portfolio.

55. A bank trustee's decision to purchase or sell investment products or securities in a trust portfolio is different than a typical retail customer.

56. If a retail or other non-trust customer wants to purchase a particular investment or security from a bank, the bank is obligated to fully disclose all material information about the investment product prior to sale.

57. Pursuant to federal and state securities laws, the bank, as the seller of the security, is required to prepare a complete and accurate prospectus or offering memorandum fully describing the investment, its risks, its suitability, the persons responsible for the management, the total fees, commissions, and expenses which will be charged, who will receive those fees, commissions and expenses, and other valuable information.

58. In a retail or other non-trustee setting, it is the customer's final decision as to whether or not to buy the product after receiving full and truthful disclosure of all material information necessary to make an informed decision. Also, in such a relationship, the customer can terminate the relationship with the bank freely and at-will anytime.

59. In a trustee relationship, there is no customer who has the final say on what product can be purchased. To the contrary, the trustee alone makes the selection. The trustee is in a clearly superior position of power and control over the beneficiaries of a trust. The beneficiaries cannot override or veto the trustee's decisions to buy and sell assets contained in the trust. Unlike most bank customers, the beneficiaries cannot unilaterally fire the trustee.

60. Legislative bodies have recognized the potential for abuse of power and have instituted laws to prevent attempts to profit from the management of the trust accounts and to ensure that trustees do not take actions to the detriment of trust beneficiaries.

61.     There is always additional scrutiny, and there should be, of a trustee's decision to invest trust moneys in its own investment products, described as self-dealing, or a conflict of interest, when the trustee profits because of the purchase of a proprietary financial product on behalf of the beneficiary. Multiple laws and fiduciary standards exist to ensure that a proprietary product has been selected because it is the best product available, not because it will financially benefit the trustee.

62.     Indiana Code Section 30-4-3-6 requires that a trustee: (a) administer the trust consistent with the prudent investor statute; (b) preserve the trust property; (c) make trust property productive for the beneficiary; (d) maintain clear and accurate accounts with respect to the trust; (e) provide the beneficiary complete and accurate information concerning any matter related to the administration of the trust; and, (f) permit the beneficiary to inspect trust property, the trustee's accounts, and any other documents concerning administration of the trusts.

63.     A trustee is required to invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In doing so, the trustee must exercise reasonable care, skill, and caution. I.C. § 30-4-3.5 *et. seq.* Among some of the circumstances that a trustee must consider in investing and managing trust assets are: (1) the role that each investment plays within the overall trust portfolio; (2) the expected total return from income and the appreciation of capital; (3) other resources of the beneficiaries; and, (4) needs for liquidity, regularity of income, and preservation or appreciation of capital.

64.     If a trustee bank uses trust funds to purchase a bank's own product, service, or security, the purchase price and any ongoing charges and costs must be fair, reasonable, and substantially equivalent to the costs of similar products and service.

65.    The trustee bank is required to disclose to the beneficiaries in writing information about all compensation, including the rate and method by which any compensation is determined, in transactions where the bank and its affiliates are acting in any capacity as the issuer of the securities or the provider of the products or services that is the subject of the sale.

66.    A trustee has a duty to only incur costs that are appropriate and reasonable in relation to the assets, the purposes of the trust, and the skills of the trustee.

67.    In connection with the management of the Christ Church Trusts, the Marion County Superior Court of Indiana issued an order reiterating the bank trustee's obligations to comply with state and common and statutory laws and to manage the Trusts' assets "for total return, with an investment objective of attaining long-term capital appreciation, preservation of capital, and moderate levels of income." (Ex. B.)

## The Christ Church Investment Committee

68.    The Christ Church Trusts are of critical importance to the Church and its mission. As of December 2013, the Church's total endowment, including the Christ Church Trusts, was approximately $67.1 million, of which JPMorgan was the Trustee responsible for $31.7 million, or approximately 47% of the total endowment.    The Church itself had direct fiduciary responsibility over about $19.8 million of the investment pool (or 30%), and another bank trustee was responsible for $15.7 million (23%).

69.    The relative size of the total endowment, which is less than $100 million, is important. This is not a large endowment that is clearly self-sustaining and can afford to invest in high-risk or high-cost investments. Christ Church relies on this endowment for its operations, ministry, charitable and artistic activities in the community and elsewhere. High-cost, high-risk, and speculative investments are not in any respect appropriate for such an endowment.

70. It is the total return of all the pools of assets that funds the Church's activities. Thus, both the growth of principal and the income derived therefrom are critical to the Church's ability to survive and to conduct its ministry and outreach programs.

71. Because of the critical importance of the Church's total endowment to its survival, Christ Church established an Investment Committee to oversee all funds and endowments, including the Christ Church Trusts. As part of the Investment Committee's duties, it communicated regularly with the trustee banks. The Investment Committee also met quarterly to review the asset allocation of the overall endowment and to assess the performance of the funds relative to the appropriate benchmarks and universes. It was also part of the Investment Committee's duties to keep abreast of best practices in asset management of endowment funds.

### The Church's Desire for Best Asset Management Practices and Products

72. As previously noted, when the Christ Church Trusts were first established, bank trustees were limited in the investment products that they could select for trusts. Banks, which were subject to the Glass-Steagall Act, could not act as investment and securities brokers. The investments procured for trust accounts were conservative and transparent. Further, fees charged by the trustee banks were all similar, reasonable, and easily understood.

73. In 1999, the Glass-Steagall Act was formally repealed, and banks were creating their own investment products. New, highly-complicated, and exotic investment products were developed and offered for sale – including derivatives, private equity investments, hedge funds, and structured notes.

74. In response, endowments and other non-for-profit institutions turned to professional investment consultants to advise them on the investments and the appropriate products to purchase for their portfolios. Typically, such professionals were paid a fee for their

15

consulting services rather than creating or selling their own products, thus providing independent advice that was not a conflict of interest or could be considered self-dealing.

75.     Christ Church sought such independent experts and consultants.  A global overall investment policy was developed with the goal to diversify and balance the Church's total investment portfolio over its total endowment pool, to ensure diversification of risk, continued preservation and growth of principal, and to obtain reasonable annual income without eroding principal to fund the Church's mission.

76.     Given the actions of trustees such as JPMorgan, it was not easy for the Church's Investment Committee to implement and monitor the overall investment program.  The trustee bank ownership was constantly changing and bank personnel responsible for the Christ Church accounts were constantly replaced.

## JPMorgan Becomes the Trustee

77.     In July 2004, JP Morgan and Company merged with Bank One Corporation, the predecessor trustee responsible for the Christ Church Trusts, and thus, became the new trustee responsible for two of three original Lilly trusts which totaled approximately $34.6 million.  As will be described more fully, over the next nine and a half years under JPMorgan's trustee management, the Trusts would only total $31.6 million.

78.     In 2004, when JPMorgan became trustee, the Christ Church Trusts were invested predominantly in domestic equities and fixed income, including a stock managed account ("SMA") which held U.S. stock and a small number of equity index and bond funds.  The portfolio was simple and utilized transparent, liquid, risk-adverse investments with reasonable trustee fees and costs.

79.     JPMorgan's initial focus was upon replacing its predecessor's Bank One funds in the Church Trusts with JPMorgan proprietary funds.  JPMorgan Funds and Bank One Funds

16

were integrated on February 19, 2005. JPMorgan customers were advised that they would be hearing more about the integration, and the JPMorgan combined fund family.

80.     In April 2005, JPMorgan representatives working in Indianapolis made a presentation to Christ Church advising that the Church was fortunate that its Trusts were now with JPMorgan and that if the Trusts had been in JPMorgan funds instead of Bank One funds, the Church would be in a better position. JPMorgan assured Christ Church that there would now be continuity of the financial team responsible for the Trusts. At the April 2005 meeting, JPMorgan presented a chart showing the total of the Trust Fund of about $34.6 million distributed as follows:   JPMorgan SMA, 27.5%; other equity and Lilly stock, 44.3%, and Fixed Income, 28.2%.

### JPMorgan's Transfer of the Trust Accounts to Private Wealth Management

81.     During 2006, the Church met with JPMorgan to discuss how the Trust Funds should be managed and the products that should be analyzed for inclusion in the Church's investment portfolio. The Church believed that JPMorgan should utilize independent money managers who could better manage the portfolio, would not have conflicts of interest and would be subject to termination if their performance fell below expected standards.

82.     However, in 2006, a JPMorgan officer advised a Church representative that the Church assets were entrusted to JPMorgan and the bank was only being courteous by listening to the Church's concerns. This reinforced the Church Investment Committee's understanding that it had no legal right or authority to make investment decisions on behalf of the Trusts, and it could not terminate JPMorgan's trusteeship.

83.     JPMorgan representatives repeatedly advised the Investment Committee that JPMorgan "owned" and exclusively managed the Trusts.

84.     Sometime in 2006, JPMorgan informed Christ Church of the bank's decision to transfer the Christ Church's Trusts from its institutional management group to its private wealth management group.

85.     According to JPMorgan, the private wealth management group had more expertise in managing accounts in compliance with trust regulations and it could provide a wider array of and access to investment products including non-JPMorgan funds. JPMorgan also advised the Investment Committee that the new group would have the ability to hire outside managers and would not be tied to just JPMorgan products.

86.     In November 2006 JPMorgan Private Wealth Management representatives met with the Investment Committee and advised it that JPMorgan would conduct a complete assessment of the Church's investment objectives, would use the Church's investment policy as a driver in selecting investments, and would constantly monitor the portfolio to ensure that it was being appropriately managed.

87.     In December 2006, JPMorgan representatives made it clear that they fully understood the nature and extent of the fiduciary duties JPMorgan owed to the Trusts as governed by the 1999 court order and the Indiana Trust Statutes. JPMorgan also advised that it was aware that the Trusts provided the majority of the Cathedral's operating income.

88.     As of December 31, 2006, the Christ Church Trusts managed by JPMorgan totaled $38.31 million and were invested in a JPMorgan SMA and three JPMorgan proprietary funds. (Ex. C.)

89.     Based upon the simple portfolio in existence for most of 2007, by December 31, 2007, the value of the Church Trusts totaled $39.2 million.

90.     As will be further discussed, the Church Trusts would never return to that value despite another six full years of costly "asset management" by JPMorgan.

**JPMorgan's Introduction of Alternatives and the Purchase of Complicated Products**

91.     In late 2007, JPMorgan made multiple unilateral investment decisions involving self-dealing at the expense of the Christ Church Trusts, and began adding multiple mutual funds including JPMorgan Intrepid International Fund and JPMorgan Asia Equity Fund.  As will be described later, these JPMorgan funds would be sold at a substantial loss to Christ Church in excess of $750,000.  This trend would continue over the remainder of JPMorgan's trusteeship.

92.     On September 17, 2007, JPMorgan representatives met with Christ Church to make a general presentation about alternative products that JPMorgan intended to purchase on behalf of the Church.

93.     Alternative investments or alternatives are terms used to describe products other than traditional equities and bonds.  Alternatives include a wide array of products including, but not limited to, gold, silver, currencies, other commodities, real estate, private equity funds, hedge funds, venture capital funds, derivatives, and structured funds and notes.

94.     At the September 17, 2007 presentation, JPMorgan advised the Investment Committee about the opportunities to invest in structured notes, derivatives and hedge funds.

95.     The JPMorgan presentation focused in large part upon the great benefits of structured notes because the Trusts would be able to participate in the market upside and earn higher than standard interest rates, but it also would be protected if there was a precipitous decline in the market.

96.     JPMorgan advised the Church that its fees for the notes were reasonable, and the bank would receive a mere 1% on the sale of each structured note.

97.     Neither the Church Investment Committee nor its advisors had experience in investing and monitoring the performance of structured notes and were not familiar with the complexities of this financial instrument.

98.     Two days later, on September 19, 2007, JPMorgan, as Trustee, used Church funds to purchase from itself on behalf of the Church, a structured note entitled "Merrill Lynch Buffered Return Enhanced NTS linked to Asian Equity Index Basket due 9/26/08" which was underwritten by JPMorgan. This note was purchased for $49,500. A year later that note was sold at a loss of $8,879.

99.     On November 30, 2007, JPMorgan, as Trustee, used Church funds to purchase another structured note from itself entitled "Barclays BK PLC Buffered Return Enhanced NTS LKD to Dow Jones Euro STOXX 50 Index Medium Term, NTSSER A due December 15, 2008" which was also underwritten by JPMorgan for $99,000. A year later, the note was sold for $74,890, at a loss of $24,110.

### The Substantial Risks of Investing in Structured Notes

100.     A structured note is a derivative investment product created by a commercial or investment bank that is linked to and derived from another underlying investment, such as the Standard & Poor's 500 Index or a foreign currency. The return on a structured note's maturity is calculated by the issuer according to a complex formula. Though linked to derivative instruments, a structured note does not have identical returns and losses to the derivative instrument because the issuer includes a series of leverages and buffers in the formula that determines the note's return.

101.     Structured notes are highly complex, risky, opaque investments. A structured note's return depends not only on the performance of the underlying derivative instruments but

also on the issuer's ability to pay.  Structured notes are not insured by the Federal Deposit Insurance Corporation.

102.    The U.S. Securities and Exchange Commission ("SEC") has warned against investing in structured notes stating that "investing in these products could mean winding up with an expensive, risky, complex, and illiquid investment."

103.    A structured note is difficult to value because of its complex and highly customized nature.  Structured notes are not listed on any securities exchange, are not subject to any uniform standards, and are lacking in transparency as to pricing and fees.  As a result, structured notes have little to no liquidity and rarely trade after issuance.

### Retrocessions

104.    The issuers of structured notes have inherent, adverse interests to the purchasers of structured notes.  Structured note issuers do not clearly disclose to buyers the amount of commissions charged and other recurring or built-in fees.  Many of the structured notes JPMorgan purchased as trustee on behalf of the Church indicate that the third-party issuers reimburse JPMorgan when JPMorgan waives its placement agent fee for fiduciary clients such as Christ Church. These types of controversial reimbursements are sometimes called retrocessions.

105.    JPMorgan never advised Christ Church of its receipt of retrocession fees (also referred to as kickbacks, finder's fees, or fee-sharing agreements) in which money was kicked back to JPMorgan for its efforts in finding investors for the investment products purchased by JPMorgan on behalf of the Christ Church Trusts.

106.    In many countries, retrocession payments which come from client assets have been deemed to belong to the client, unless expressly agreed otherwise by the client in full knowledge of the relevant facts.

107.    The Church was not provided with term sheets and prospectuses for these structured products, which revealed that the notes were purchased by JPMorgan as Trustee for the Church from JPMorgan as placement agent. The Church also never understood how the returns were calculated, the substantial risks associated with these notes, or the total fees embedded and hidden in these products.

### JPMorgan's Increase of Financial Products Including Its Own Proprietary Funds

108.    By year-end 2007, JPMorgan began to dramatically change the Christ Church Trusts portfolio. The Trusts were no longer invested in the JPMorgan SMA and three mutual funds.

109.    Over the last few months of 2007, JPMorgan purchased or placed monies in over twenty-three financial products including two structured notes underwritten by JPMorgan and multiple JPMorgan proprietary products.

110.    The amount and selection of the specific financial products made little sense to the Church's Investment Committee. The portfolio was unnecessarily over-diversified, illogical, and not consistent with a coordinated investment strategy.

111.    The portfolio also included odd choices in relatively small amounts, such as a $50,000 purchase by JPMorgan from itself of the JPMorgan India Fund ("India Fund") using Church Trusts funds, which would be sold just seven months later at a 42% loss, for $28,902. The failing JPMorgan India Fund was eventually liquidated and dissolved.

### The Purchase of Hedge Funds

112.    In 2008, JPMorgan as trustee began pushing Cayman Island managed hedge funds, more structured notes, and other additional JPMorgan proprietary funds. The Church was concerned over the bank's objectivity as JPMorgan was switching to higher-fee funds using Church funds.

22

113.    A hedge fund is an unregulated pool of private capital. Hedge funds are often not what they purport to be – a product aimed at reducing or hedging against risk. Instead, hedge funds have evolved into becoming aggressively managed portfolios of investments which use high risk investment strategies, such as investing with borrowed money or leveraged transactions, in hope of realizing large, speculative capital gains, while risking substantial losses. They are not insured, lightly regulated, and involve massive and little-known operational risks.

114.    Hedge funds are typically high cost, high risk, illiquid, and opaque investments. That is, they lack most of the hallmarks of a prudent investment, i.e., reasonable cost and risk, liquidity, and transparency, that are appropriate for trusts such as the Christ Church Trusts.

115.    As a result of the lack of transparency, it is virtually impossible for stakeholders (such as Christ Church) to know the answers to questions as fundamental as who is managing the money, what is the money invested in, where is it (i.e., who is keeping custody of the money or investments funds), and what are the fees?

116.    Alternative investments, including hedge funds, that are incorporated and regulated under the laws of foreign countries present additional, unique risks which fiduciaries must consider. Investors can find themselves embroiled in Cayman Islands courts (and other foreign jurisdictions) in order to liquidate the investments.

117.    Hedge fund assets may also be held by different custodians located around the world.

118.    During 2008, JPMorgan unilaterally purchased $1 million of shares from itself in Blackstone Partners Offshore Fund Ltd. ("JPMorgan Blackstone Offshore Fund"), a Cayman Islands hedge "fund of fund of funds."

23

119.    A hedge fund of fund of funds is a conduit or feeder fund which charges a fee to invest its assets in a fund of funds which also charges a fee to invest its assets in underlying funds, which also charges additional fees.  Total fees related to a hedge fund of fund of funds generally exceed 8%.

120.    The JPMorgan Blackstone Offshore Fund is a "feeder fund" created by JPMorgan to invest its assets (which were obtained from JPMorgan clients) into Blackstone Partners Investment Fund L.P., a Delaware limited partnership (the "BAAM Onshore Fund"), and Blackstone Partners Fund Ltd., a Cayman Islands Company (the "BAAM Offshore Fund"). Blackstone Alternative Asset Management L.P. ("BAAM"), is the manager of this hedge fund of funds.  BAAM and its two funds, in turn, invested their assets with 163 underlying hedge fund managers.

121.    The Church trusts do not own any interest in BAAM.  Only the JPMorgan Blackstone Offshore Fund created by JPMorgan owns a stake in BAAM.

122.    JPMorgan did not disclose to the Church that JPMorgan Securities, Inc. and JPMorgan private banking affiliates had entered into a distribution and cooperation agreement with BAAM whereby JPMorgan would receive 50% of the management fee and 20% of the incentive fee annually attributable to shares purchased by JPMorgan clients.

123.    Unbeknownst to the Church, J.P. Morgan Securities LLC was a "special limited partner" in the Onshore Fund.

124.    JPMorgan also concealed from the Church multiple issues of material facts that anyone investing in such a complicated fund would want to know including, but not limited to:

> a.    the fund was a recently formed entity with no operating history upon which prospective investors could evaluate the fund's likely performance;
>
> b.    the myriad fees related to the fund (8+%) were so onerous that the fund was doomed to underperform on a net basis;

    c.      the fund was speculative, involved a high degree of risk, and an investor could lose all or a substantial amount of the investment;

    d.      the money managers selected by BAAM used controversial investment techniques such as short sales, substantial leverage, securities lending, investments in non-marketable securities, uncovered options, forward transactions, and futures and options on future transactions, foreign currency transactions, and highly concentrated portfolios, among others, which could magnify losses;

    e.      compensation would be received by multiple parties based upon the performance of the investments which created a strong incentive to make investments that are more risky and speculative in order to seek higher returns;

    f.      the fund was not regulated or insured by governmental regulatory authorities; and,

    g.      a number of actual direct conflicts of interests existed between the JPMorgan private banking client investors, including the Church, and JPMorgan, BAAM and the underlying money managers.

125.    By the end of 2008, the Trusts' portfolio had decreased to $26.69 million from $39.2 million in December 2007, a loss in value of $13.5 million while JPMorgan's disclosed annual fees had doubled in size. A staggering 85% of Church assets were invested in JPMorgan proprietary and affiliated products.

### JPMorgan's Defense of Hedge Funds and Purchase of Additional Proprietary Products

126.    In January, 2009, JPMorgan met with the Church to defend its investment of $1 million in the Blackstone Offshore Fund. According to JPMorgan, the Church did not need to be concerned since the selection of the hedge fund was a well-researched product and over thirteen dedicated JPMorgan analysts had recommended this product.

127.    According to JPMorgan, the bank's "Due Diligence Team" actively and continuously analyzed and evaluated each hedge fund, including Blackstone, and that this type of

due diligence oversight helps "reduce all types of hedge fund risk that do not translate into returns for clients." The Church was told that "Blackstone has done well."

128.   In April, 2009, the Church, seeking to rebalance its portfolio in accordance with both the Church's and JPMorgan's own investment policies, requested that JPMorgan re-allocate the portfolio and move funds from bonds to equities. JPMorgan agreed to increase equities so that the Trust's asset allocation for equities would be in line with the Church's policy and within JPMorgan guidelines.

129.   Unbeknownst to the Church, following that meeting, a then-JPMorgan employee incorrectly concluded that the Trusts were under-allocated to bonds. The then-JPMorgan employee, without consulting any other individuals, proceeded to sell millions of dollars in equities and purchase bonds, the exact opposite of the Investment Committee's request, and contrary to JPMorgan's own position that it was time to invest in equities, thereby causing substantial damages to the Trusts.

130.   A JPMorgan employee wanted to advise the Church that it had wrongfully failed to buy the equities as agreed, thus, losing about $1 million for the Church Trusts. A supervisor ordered him not to notify the Church inasmuch as JPMorgan was the Trustee and had complete control over the investments.

131.   On August 18, 2009, a JPMorgan employee met with the Investment Committee and gave "a less-than-clear explanation of why he did not move bond money into equities as he had promised."

132.   Because the portfolio had significantly declined in value, both in absolute value and in comparison with other similar endowments, and because the disclosed fees had increased

by 300%, the Church decided to request more involvement in the management and supervision of the portfolio.

133.    On September 28, 2009, the Christ Church Investment Committee and its consultant requested input and some control in the selection of investments in reaching the Church's objectives. (Ex. D.)

134.    On December 3, 2009, JPMorgan rejected Christ Church's request and advised the Investment Committee that JPMorgan had full authority over the investment management of the Christ Church Trusts and that Christ Church's Investment Committee had no fiduciary responsibility over the trust accounts.   Accordingly, JPMorgan advised it would not take recommendations from the Investment Committee.  (Ex. E.)

135.    In its letter, JPMorgan further stated: "Christ Church benefits from working with JPMorgan as a leading asset manager with over one trillion dollars in client assets under management."   According to JPMorgan, its goal was "to select managers we expect to outperform over a market cycle, ensure managers are appropriately positioned in client portfolios and direct flows to our highest conviction managers."

136.    JPMorgan did not select the best managers at the best cost.  Instead, JPMorgan used Church funds to buy its own proprietary products or to buy products from third-parties who would kick back revenues to JPMorgan for placing clients in their financial products.

137.    By the end of 2009, JPMorgan had used Church funds to invest in fifty-two (52) separate investment vehicles, the majority of which were JPMorgan proprietary or related funds. At this time, 75% of Church assets were invested in JPMorgan proprietary products.

### The Purchase of Additional Hedge Funds

138.    In 2010, JPMorgan as trustee continued to:   (a) make unilateral investment decisions as to which products to purchase for the Church portfolio; (b) buy from itself new

high-cost, high-risk fund products; and, (c) unilaterally increase its disclosed and undisclosed fees.

139.    In 2010, JPMorgan purchased from itself two additional hedge funds created by JPMorgan.

140.    In May 2010, JPMorgan as trustee purchased from itself $1.5 million in shares of "Och-Ziff OZO Private Investors Offshore Ltd" ("JPM Och-Ziff Feeder Fund"), a Cayman Island company created by JPMorgan in 2008 and administered by J.P. Morgan Private Investments, Inc., a Delaware corporation and wholly-owned subsidiary of JPMorgan.

141.    The JPM Och-Ziff Feeder Fund then purportedly invested "substantially" all of its assets in OZ Overseas Fund II, Ltd. ("OZ II"), a Cayman Islands exempted company, and OZ Overseas Intermediate Fund II, L.P., (the "OZ Offshore Intermediate Fund"), a Cayman Islands limited partnership.   OZ Management LP, a Delaware limited partnership, was the investment manager of OZ II, the OZ Offshore Intermediate Fund and OZ Master Fund, Ltd. ("OZ Master Fund"), another Cayman Islands exempted company.   There are multiple other entities, all of which would receive revenues included OZ Advisors II LP, OZ Administrative GP LLC, and OZ Investment Manager.

142.    According to the prospectuses, "certain select clients of J.P. Morgan are being offered the opportunity to invest in the Offshore Feeder, and thereby to participate in the Offshore Feeder's investment in OZ II."

143.    There was no presentation to Christ Church about this complicated investment, why the Church was selected for the "opportunity" to invest in the JPMorgan Och-Ziff Feeder Fund, nor did JPMorgan provide the Church with the prospectuses, term sheets, subscription

agreements, and an explanation relating to the multiple layers of fees and expenses and their monetary amounts.

144.    The JPMorgan Och-Ziff Feeder Fund prospectus listed multiple risks including the lack of operating history upon which investors can evaluate the likely performance of the Offshore Feeder, the absence of regulatory oversight, the existence of multiple conflicts of interests that JPMorgan and the funds have with investors, the limited liquidity of the investment, and that an investor may lose all or part of its investment.

145.    It is clear that multiple JPMorgan entities were receiving revenues off of this investment including:

a.    JP Morgan Clearing Corp. as a primary broker of the underlying funds providing clearing, settlement and custodial facilities and services;

b.    JPM Chase Bank, for receiving subscriptions, disbursing redemptions, payments and processing;

c.    JPMorgan Securities, Inc. and its private banking affiliates based upon a distribution and cooperation agreement with the underlying funds whereby JPMorgan would receive up to 50% of the management fees and 20% of the incentive fees attributable to the shares of any investment introduced by JPMorgan; and,

d.    JPMorgan Private Investments, Inc., for administration of all of the offshore feeders.

146.    The JPMorgan Blackstone Offshore Feeder expenses that investors would be required to pay included a wide range of categories including organization and offering expenses, all expenses incurred in making investments, ongoing business operations, including legal, administrative, accounting, tax, audit, government charges and insurance expenses, custodial fees, interest, payments to JPMP and affiliates, borrowing expenses, and extraordinary expenses including litigation and indemnification expenses.

147.    According to the prospectus, "The rate of return of an investor in the [JPMorgan created Och-Ziff] Offshore Feeder will be less than the rate of return realized by a direct investor in OZ II due to these expenses."

148.    Those are just JPMorgan fees and expenses.  Investors, such as Christ Church, were also subjected to paying the underlying Och-Ziff funds' fees, commissions, and expenses as well.

### Additional Hedge Fund Purchases

149.    Throughout 2011, JPMorgan purchased from itself with Trust funds, six additional offshore hedge funds created by JPMorgan including Avenue International, LTD (Cayman Islands); Chilton Global Natural Resources International II (British Virgin Islands); Goldentree Offshore Fund II, LTC (Cayman Islands); Perry Investors Offshore LTD (Cayman Islands); Standard Pacific Capital Offshore Fund, LTD (British Virgin Islands); and Third Point Offshore Fund, LTD, (Dublin, Ireland and Cayman Islands).

150.    All of these JPMorgan offshore feeder funds were created by JPMorgan, had no history of performance, and were subject to the same massive risks and expenses as previously described for the Blackstone and Och-Ziff feeder hedge funds created by JPMorgan.

151.    JPMorgan received sizeable revenues from these hedge funds.  Every one of these hedge funds were subjected to multiple fee and costs payments.  For example, in 2011, JPMorgan used $600,000 of Church Trust funds to purchase from itself shares in Chilton Global Natural Resources International II, a hedge fund, which resulted in a subsequent sizeable loss to the Church of $200,924.  Unlike the Church, JPMorgan profited handsomely.  According to the prospectus, JPMorgan was one of the Funds prime brokers, received management, incentive and placement fees, provided clearing and settlement facilities and custodial services for a fee.

**Christ Church's Request to JPMorgan for Disclosure of All Revenues Relating to the Trusts**

152.    In 2011, the Church began to question JPMorgan directly about its total revenues from all of the investment products in the Trusts portfolio including all revenues received by any JPMorgan entity.

153.    During 2011, the Church asked JPMorgan for the actual amounts of fees, costs, expenses, and other income received by JPMorgan and its affiliates and subsidiaries as well as revenues received from third parties placed on JPMorgan's platform of approved financial products.

154.    JPMorgan as trustee never disclosed the total amount of revenues it received from all sources based upon its use of Church funds.  Instead, JPMorgan provided carefully worded explanations relating to only a portion of the fees and costs received by JPMorgan Private Bank alone, avoiding the questions posed to it by the Church.  The limited explanations of fees to the Church included complicated, inconsistent, and inaccurate descriptions of fees in general terms.

**The Purchase of Private Equity Funds**

155.    In 2012, JPMorgan as trustee committed $1 million dollars in two high-risk, high-cost, illiquid private equity conduit funds created by JPMorgan obligating the continuing investment of Church funds in these financial products until at least 2023.

156.    A private equity fund is an investment consisting of equity securities and debt in operating companies that are not publicly traded on a stock exchange.

157.    Private equity funds can lead to potential abuses because they are so opaque. Managers have broad discretion which also means that investors have a hard time knowing what the managers are doing.

158.    According to the SEC, private-equity firms have created bogus service providers to boost fees they charge to portfolio companies and investors.  More than half of about 400 private-equity firms examined by SEC staff were found to have inflated fees and expenses charged to companies in which they hold stakes.

159.    On January 23, 2012, JPMorgan committed $500,000 of Christ Church funds in SOF IX Private Investors Offshore, LLP ("SOF Offshore Conduit"), a partnership created by JPMorgan and administered by J.P. Morgan Private Investments, Inc.  That JPMorgan SOF Offshore Conduit in turn invested in Starwood SOF IX Private Investors LP ("Starwood").

160.    Sixteen days later, on February 8, 2012, JPMorgan committed an additional $500,000 in KKR NA Private Investors Offshore, L.P. ("KKR Offshore Fund"), a limited partnership created by JPMorgan to invest in KKR North America Fund XI, Private Investors, LLC ("KKR North America").

### Robo-Signing of Subscription Agreements

161.    JPMorgan notified the Church about its purchase of the two private equity investments in a form "welcome" letter.

162.    For example, on March 8, 2012, JPMorgan, sent a letter to the Church, welcoming Christ Church as an investor in KKR NA XI Private Investors Offshore, L.P., a JPMorgan conduit fund administered by JPMorgan Private Investments Inc., which in turn invested in KKR North America Fund XI L.P.

163.    Enclosed was the signature page of the Subscription Agreement binding Christ Church.  (Ex. F)  The full subscription agreement was not attached.

164.    The KKR signature page to the subscription agreement was not signed by the Church – it was not even signed by a person.  The signature was a computer-generated robo-

signature bearing no resemblance to any name. Underneath the robo-signature was the printed name of Matthew Crenshaw, Portfolio Manager.

165. On the last page of this subscription agreement, Mr. Crenshaw, on behalf of the Church, advised KKR that the Church Trusts had read and understood the conduit subscription and agreements and the Church recognized that it was contractually bound to the $500,000 capital commitment, as well as additional and separate payments for a variety of substantial fees, costs, and expenses, including fees to be received by JPMorgan.

166. The full subscription agreement, which was not provided to the Church, contained substantial information and disclosures that JPMorgan was required to provide to investors ensuring that they were fully informed of all conflicts, risks, and costs, including a litany of past regulatory settlements involving JPMorgan. The Church did not receive, review, or execute the agreement.

167. By executing the subscription agreement on behalf of the Church Trusts, JPMorgan represented to the private equity managers that it had reviewed the underlying trust agreements and the Church Trust was a suitable investor authorized to invest in a private equity offshore fund.

168. There is no evidence that JPMorgan determined that KKR North America and Starwood private equity funds comported with the terms of the Will, Indiana law, and the 1999 court order. Nor could JPMorgan make such a statement. They do not comport with the 1999 order, or Indiana Law.

169. The offering memoranda for both the underlying Starwood and KKR private equity investments and the JPMorgan offshore conduits, describe the dangers of investing in these funds since they:

a.  involve a high degree of risk and should only be made with discretionary capital set aside strictly for speculative purposes;

b.  could result in the loss of all or a substantial portion of the investor's investment;

c.  are illiquid and require a long-term commitment, with no certainty of return, no market for the sale of the interests, and investors cannot withdraw their capital would tie up Church funds for over a decade;

d.  are not regulated or approved by any regulatory agency;

e.  are subject to substantial management fees and carried interest on realized profits which will lower the investor's return; and,

f.  there are multiple conflicts of interest between the funds adverse to investors, including Christ Church.

170.  The Church Trusts are invested in the JPMorgan conduit, not the KKR fund. Worse still, the underlying KKR fund has warned that it does not owe fiduciary duties to its investors.

171.  The KKR North America Limited Partnership Agreement contained provisions that reduce or eliminate the duties of the Fund's General Partner, including fiduciary duties, to the Fund and its investors and provisions which limit the remedies of the investors in the Fund with respect to breach of such duties. In other words, JPMorgan as trustee invested Church Trust Funds with a private equity manager that prominently warned potential investors that they owed no fiduciary duties to anyone.

172.  The Church did not, and would not have, executed the KKR Agreement.

173.  Despite the fact that JPMorgan is no longer trustee, it continues to receive fees relating to these two private equity offshore feeders.

174.  By committing $1 million to the two investment funds created by JPMorgan, JPMorgan also agreed that Church funds would be required to pay annual management fees and expenses to JPMorgan.

34

175.   On March 12, 2014, JPMorgan Private Investments Inc., as administrators for KKR Offshore Feeder Fund which it created, required Christ Church to fund a capital call totaling $6,559.00 to pay six months of management fees and fund expenses to the JPMorgan created conduit.

176.   The successor trustee for the Church is unable to liquidate these private equity investments and to sever ties to JPMorgan, stuck with an investment in cannot sell, for which it must pay ongoing fees, and which it does not really own.

177.   Christ Church is required to rely upon JPMorgan's estimate of the value of these funds. There is no independent way to verify if the "estimated value" of Starwood or KKR is accurate. All information relating to both funds are non-public. There is no market value that can be assigned to it.

178.   The Church Trusts cannot deal with KKR or Starwood directly. The Trusts do not own an interest in KKR or Starwood. The Church's investment is in the JPMorgan conduits. Thus, under the subscription agreement, which JPMorgan signed on behalf of the Church, the Church will be required to pay JPMorgan annual fees until at least 2023.

### JPMorgan's Intentional Concealment of Information from Christ Church

179.   Unbeknownst to Christ Church, JPMorgan was actively concealing material information from the Church which would explain the dismal performance of the portfolio, the reasons Church funds were invested in high-risk, high-cost, opaque investment products, and the exorbitant fees that JPMorgan was actually receiving for its "management" of the Church accounts.

180.   JPMorgan had a plan to substantially increase its revenues by manufacturing complex, opaque investment products which it would push off to its clients.

181.   Unlike JPMorgan, many banking institutions have deemphasized or jettisoned in-house mutual fund families and proprietary products altogether over concerns of wrongful sales practices.  By contrast, JPMorgan's assets under management and the number of its proprietary funds and products have grown at a rapid place.  In fact, in 2013 its asset management group generated $11.3 billion in revenue.

182.   Historically private banks and other asset managers relied upon the "closed architecture" platforms they built when picking investments for their clients.  That is, they allocated client assets exclusively to their own proprietary products without regard to whether a third party offered greater demonstrated expertise or lower cost.  Such closed architecture involves a blatant potential conflict of interest and breach of fiduciary duty.  Directing client assets to proprietary products provides the investment adviser with an obvious economic advantage, and often results in sub-optimal investment performance and excessive fees to the client.

183.   Accordingly, many banks and wealth managers have instead built "open architecture" platforms that offer a wide range of investment products run by outside managers.  Others offer no internal products and offer the purest form of open architecture.  A true open architecture program – where the best managers are selected to manage client assets – can severely impact a bank's asset management revenues since the bank's proprietary products will not be selected.

184.   While JPMorgan claims to offer open architecture, the process by which JPMorgan manages discretionary investment portfolios for clients is, in reality, substantially closed in that proprietary products are heavily preferred.  JPMorgan internally refers to its process as "guided architecture."

185.   The JPMorgan "guided architecture" process, giving preference to JPMorgan proprietary products, violates the fiduciary duty the firm owes to its investment advisory clients.

186.   Many of the JPMorgan proprietary products that were pushed upon clients were in fact toxic, i.e. structured in a manner that would ensure that JPMorgan and its subsidiaries would receive substantial fees, oftentimes receiving more in fees than its clients, including Christ Church, received in returns from the investment.

187.   JPMorgan, painfully aware of diminishing traditional bank revenues (including interest and mortgage fees), as a corporate strategy, turned to the sale of proprietary products, particularly alternatives, to improve its financial statements.

188.   In 2006, JPMorgan advised its shareholders that one of its major accomplishments was its growth of alternative assets under management by 35% to $100 billion.

189.   In 2007, JPMorgan advised that its Asset Management business group had a record 40% increase in profits largely due from the commissions and fees generated by the sale of JPMorgan investment products.

190.   The Asset Management Group, which includes Private Wealth Management, reported other record revenues every year thereafter, based in large part on the sale of private equity, hedge funds, and alternative funds.

191.   In order to achieve these record returns, JPMorgan had a plan in place to encourage its employees to steer customers to the high income producing products manufactured and created by JPMorgan.

192.   JPMorgan pressured its "investment advisors" to sell unsuitable investments to clients including Christ Church because of the high fees, commissions, and other benefits that the bank would receive from the transactions.

193.    Periodically, each investment advisor would be provided an asset allocation per client. These asset allocations were determined by unknown individuals in Columbus, Ohio and New York – not any of the JPMorgan employees that worked directly with the Church's Investment Committee.

194.    Once the asset allocation for the Church had been determined, the investment advisor would then be able to select from a very limited number of investment products to meet that asset allocation.

195.    These investment products often had higher fees than other products on the market and were usually proprietary in nature.

196.    In addition to the asset allocation instruction that JPMorgan investments advisors utilized, JPMorgan would also periodically provide its investment advisors with a "scorecard" that provided sales goals and targets.

197.    The scorecard gave greater emphasis to investments products that had higher fees, such as structured notes, hedge funds, or private investments.

198.    JPMorgan investment advisors received higher commissions, bonuses, and other salary incentives based upon their ability to sell the products emphasized on the scorecards.

199.    JPMorgan also provided additional compensation to investment advisors if they were able to increase profitability within the regional private wealth management groups. Profitability was increased, in part, by selling investment products with higher internal fees.

200.    Christ Church was never privy to the periodic asset allocations, scorecards, or compensation formulas used to pay the "investment advisors" responsible for their Church Trust account.

## The Church's Return on Structured Notes

201.    Between 2007 and 2013, JPMorgan purchased $16.5 million from itself using Church funds in 88 different high cost, high risk, low-return, structured notes sold by its affiliates.

202.    It is impossible for the Church to determine if it even received the correct returns due on each structured note.  There is very little public information available to verify the value of each extraordinary complex structured note, what the indexes were on the date of redemption or whether the redemption value was calculated correctly.

203.    Further, JPMorgan concealed the amount JPMorgan paid for the note, and the method and rate of fees charged and received by the issuer and JPMorgan and its affiliates.

204.    JPMorgan never advised Christ Church of its receipt of retrocessions or kickbacks in connection with the notes.

205.    Ultimately, after over six years of JPMorgan's investment of Trust funds in these high-cost, high-risk structured notes, the Church received a total return of about 9.34%, which equated to an annualized return of only 1.44%.  It is estimated that JPMorgan and the Issuers may have received as much as 11% in fees, exponentially more than the 1.44% annualized return the Church received even though the Church, not JPMorgan, bore all of the risks of the investment.

## Other Proprietary Products

206.    Besides structured notes, hedge funds, and private equity investments, JPMorgan as trustee placed Church funds in multiple other JPMorgan proprietary funds as well, many of these funds were toxic and doomed to failure.

### JPMorgan Intrepid International, Asia, Equity, and India Funds

207.    Between May 2007 and March 2010, JPMorgan made multiple purchases of the JPMorgan Intrepid International Fund ("Intrepid"), ultimately resulting in a loss of $230,000.

208.    The loss is not surprising when the details of the fund are known.   There are multiple subsidiaries receiving fees including advisor JPMorgan Investment Management, Inc. (as investment advisor), JPMorgan Funds Management Inc. (the administrator), JPMorgan Distribution Services (Distributor), and other JPMorgan entities.

209.    Intrepid paid multiple fees and expenses including annual operating costs, and transaction costs and commissions when it bought or sold securities (or turned over its portfolio resulting in in higher expenses).   According to one report the Fund experienced a portfolio turnover rate of 79% in one year alone.

210.    Further, Intrepid provided cash payments to financial intermediaries, including JPMorgan affiliates, whose customers invest in the JPMorgan fund that provide shareholder, sub-transfer agency, marketing support and other services which can be an expense reimbursement.

211.    JPMorgan also paid finder's fees which provided an incentive to favor the sales of Intrepid shares over investment options they can make available to their customers.

212.    From 2007 through 2012, JPMorgan used Church Trust funds to purchase from itself $1.698 million in the JPMorgan Asia Equity Fund.   After three years of placing these Church Trusts funds at risk, the Trusts suffered a loss of $522,379.   This fund was dissolved in July 2012.

213.    In 2007, JPMorgan purchased from itself $50,000 in the JPMorgan India Fund which lost $28,900, a fund that was dissolved as well in 2012.

214.    While the Church lost $781,000 from these three JPMorgan Funds, JPMorgan profited.

## JPMorgan's Purchase of Highbridge Capital Management

215.   In 2008, the JPMorgan began investing Church funds in new JPMorgan proprietary funds offered by Highbridge Capital Management, LLC ("Highbridge"), a hedge fund company acquired by JPMorgan for a reported $1 billion.

216.   Securities firms, including JPMorgan, were not content merely to profit from serving hedge fund clients.   Instead, they want to generate lucrative hedge-fund fees for themselves – including a 2% annual management fee plus 20% of the profits generated.

217.   The first major securities firm to buy a hedge fund was JPMorgan Chase, which acquired Highbridge Capital Management, for an estimated $1 billion.   The acquisition of Highbridge began in 2004 when JPMorgan acquired a majority interest in the company.   The acquisition was completed in 2009.

218.   Following JPMorgan's acquisition, Highbridge's investment performance significantly deteriorated.   The decline in performance caused the firm's assets under management to plummet.

219.   Where it had investment discretion, JPMorgan steered clients such as Christ Church into the Highbridge funds despite the fund's dismal performance.   As external investors fled the funds, the percentage of assets in Highbridge funds held by JPMorgan fiduciary accounts skyrocketed.   Without JPMorgan's guiding their clients to invest in Highbridge, the value of the Highbridge organization would have nearly collapsed.

220.   JPMorgan invested $1.844 million of Church Trust funds in JPMorgan Highbridge Statistical Market Neutral Fund and JPMorgan Highbridge Dynamic Commodities Fund ("Highbridge Market Neutral Fund" and "Highbridge Commodities Fund").

221.    Between July 2008 and November 2010, JPMorgan purchased from itself over $1.28 million of Church funds in Highbridge Market Neutral Fund.  After tying up these Church Trust funds for 2 ½ years, the Church lost $34,492 on that investment.

222.    Between May 2010 and April 2013, JPMorgan purchased from itself $559,125 of shares in the Highbridge Commodities Fund.  After typing up those funds for three years, the Church lost $59,814.83.

223.    The only one profiting from these two Highbridge investments was JPMorgan.

### Canton, Illinois

224.    JPMorgan's knowing and intentional violation of its breach of trust is corroborated by its similar treatment of other Trusts in the United States.  The Highbridge funds were not a disaster simply for Christ Church.  In fact, JPMorgan engaged in a pattern and practice to harm many other Trust accounts and force upon them unsuitable investments in order to generate revenues and other benefits to itself.

225.    Canton, Illinois is a small town with a population of a little over 14,000 as of the 2000 Census.  The Parlin-Ingersoll Public Library ("the Canton Library"), multiple churches, the Canton high school, the Canton hospital, and other community organizations rely upon the income from two trusts – the Charles D. Ingersoll Trust (the "Charles Trust") and the William P. Ingersoll Trusts (the "William Trust"), both established in the 1940's.

226.    In 2004, just like Christ Church, the Canton Trust beneficiaries inherited JPMorgan as a trustee when it merged with Bank One.

227.    With respect to the Charles Trust, its 2007 value totaled $27.23 million.  But under JPMorgan's trust "management", by 2013, the value of the trust had decreased by $2.3 million to $24.9 million.

228.    On October 18, 2013, the Canton Library sent a letter to JPMorgan Private Wealth Management regarding their concerns about investments made in the management of the Charles Trust including JPMorgan's purchase from itself of multiple structured notes, hedge funds, and other proprietary financial products. (Ex. G).

229.    The Canton Library pointed out that JPMorgan had not kept track with other recognized indexes and had dramatically changed allocation formulas, by reducing equities and replacing them with high-cost alternatives. As the Canton Library further noted JPMorgan "gained just $120,600 in three years and three months."

230.    The Canton Library specifically questioned JPMorgan's investment of $750,000 in JPMorgan Highbridge Dynamic Commodities Strategic Fund since the fund was "apparently launched in 2010." As the Canton Library noted, the Highbridge Commodities Fund had no history of management or performance, had the lowest Morningstar rating, and had been sold at a loss of over $254,000.

231.    On October 29, 2013, JPMorgan responded to the Library advising that it had "crafted investment guidelines specifically designed for the challenges facing foundations." (Ex. H.)

232.    With respect to the Highbridge loss of $254,000, JPMorgan made no apologies. Instead it stated:

> Let me also briefly address Highbridge. Highbridge was a high-conviction manager when we established the position in the Dynamic Commodities Strategic Fund (HDCSX). The underlying commodity mix was more heavily weighted toward agriculture, which unfortunately did not work out well. We removed the manager from our client portfolios in March 2013, replacing it with Pimco Commodity Plus (PCPLX), which has a better underlying asset exposure.

233.    It is feared that the William Trust has been mismanaged as well. That trust was set up as a blind trust. None of the beneficiaries receive any financial reports about the value of

43

the trusts or the specific financial products that are in the William Trusts – all they know is that the distributions they receive are smaller, and not growing.

## LEGAL CLAIMS

### Count I
### Constructive Fraud

234.    The allegations contained in paragraphs 1 through 233 of this Complaint are incorporated herein by reference.

235.    As Trustee of the Christ Church Trusts, JPMorgan owed a legal duty to Christ Church.

236.    JPMorgan violated that duty by making deceptive material misrepresentations of past or existing facts and failing to disclose material information that it had a duty to disclose.

237.    Some of JPMorgan's false statements to Christ Church include:

    (a)    Advising Christ Church that was acting in the best interests of Christ Church, when in truth and in fact, it was acting in the best interests of JPMorgan;

    (b)    Advising the Church that it had a dedicated team of fiduciaries and analysts who carefully reviewed every investment in order to minimize risk prior to using the Church Funds when in truth and in fact, the risk associated with the multiple hedge funds, structured notes, private equity investments, and proprietary products were astronomical and many were toxic – with so many built in fees and expenses which would ensure that JPMorgan would make almost as much or more than the Church even though the Church bore all of the risk of the investments;

    (c)    Advising the Church that it was selecting the best products available to the Church, when in truth and in fact, there were multiple other investment products far superior to, with less expenses, and a long history of producing returns than the newly created investment products manufactured by JPMorgan;

    (d)    Falsely disclosing the method and nature of compensation in regards to the fees, expenses, costs and other remuneration received by JPMorgan and its subsidiaries, affiliates, and third parties in connection with the Christ Church Trusts; and,

(e)     Robo-signing subscription agreements falsely claiming that the Trusts were fully aware of the substantial risks, high costs, and inherent conflicts in the financial products.

238.    Some of JPMorgan's material omissions of fact concealed from the Church include:

(a)     JPMorgan has a guided architecture platform ensuring that its products were being selected to the detriment of the Church;

(b)     employees were encouraged and bonuses were paid in part for the sale of proprietary products;

(c)     many of JPMorgan's investment products were toxic and doomed to failure;

(d)     there were multiple undisclosed fees and expenses;

(e)     there were substantial revenues, retrocessions, and revenue sharing agreements received by JPMorgan by third parties in exchange for selling their products to JPMorgan clients; and,

(f)     JPMorgan employees did not carry out an agreement to purchase equities, causing a loss of $1 million to the Church and then affirmatively concealing the wrongful behavior from the Church.

239.    Christ Church justifiably relied upon, and in fact was forced to rely solely upon, JPMorgan to disclose material and truthful information and prudently manage the Trusts.

240.    Christ Church was injured as the proximate result of JPMorgan's deceptive practices and actions.

241.    JPMorgan gained an advantage at the expense of Christ Church.

## Count II
## Breach of Trust

242.    The allegations contained in paragraphs 1 through 241 of this Complaint are incorporated herein by reference.

243.   From July 2004 through December 24, 2013, JPMorgan was the trustee responsible for prudently and ethically managing the Christ Church Trusts for the benefit of Christ Church.

244.   As a result of the trustee/beneficiary relationship, JPMorgan owed a duty to Christ Church to manage the Trusts consistent with the terms of the Will, federal and state laws, and the 1999 Marion County Probate Order.

245.   JPMorgan did not manage the Christ Church Trusts for the sole benefit of the beneficiary, Christ Church, in violation of its trust and fiduciary duties and the 1999 Order. To the contrary, its management has been in the best interests of JPMorgan and at the expense of the Church.

246.   No one at JPMorgan served as an ombudsman protecting Christ Church.

247.   JPMorgan has breached that trust by failing to:

    a.    preserve trust property;

    b.    make the trust property productive for the beneficiary;

    c.    maintain clear and accurate accounts with respect to the trust;

    d.    keep beneficiaries reasonably informed about the administration of the trust and of material facts necessary for the beneficiaries to protect their interests;

    e.    otherwise manage the trust as would a prudent investor; and,

    f.    disclose the method and rate of compensation for all fees received at the expense of the Church.

248.   JPMorgan has injured Christ Church.

249.   Christ Church seeks recovery of:

    a.    Any loss of depreciation in the value of the trust property as a result of the breaches;

    b.    Any profit made by the trustee through the breaches;

c.  Any reasonable profit which would have accrued on the trust property in the absence of a breach; and,

d.  Reasonable attorney fees incurred by the beneficiary in bringing an action on the breach.

250.  The Christ Church Trusts portfolio managed by JPMorgan was over-diversified, not transparent, and improperly invested in high-cost, high-risk, illiquid, unsuitable, financial products, including investment products benefitting JPMorgan, not Christ Church.

251.  JPMorgan has engaged in self-dealing and there are multiple conflicts of interest with its selection of JPMorgan products or agreements with third-parties to sell investment products.

252.  There was no institutional oversight to ensure that the Church Trusts were managed in accordance with the high fiduciary standards and obligations that JPMorgan owed to Christ Church.

253.  Furthermore, JPMorgan acted willfully, wantonly, and with malice, or in reckless disregard of its duties.  Therefore, Christ Church seeks punitive damages.

### Count III
### Violation of Indiana State Securities Law

254.  The allegations contained in paragraphs 1 through 253 contained in this Complaint are incorporated herein by reference.

255.  JPMorgan is and was a person involved in the offer, sale, or purchase of securities.

256.  In connection with the offer, sale, or purchase of securities in the Christ Church Trusts, JPMorgan: (a) employed a device, scheme, or artifice to defraud Christ Church; (b) made untrue statements of a material fact to Christ Church;  (c) omitted to state material facts to Christ Church necessary in order to make the statement made, in light of the circumstances under which

it was made, not misleading; and, (d) engaged in an act, practice, or course of business that operated as a fraud or deceit upon Christ Church.

257.   JPMorgan did in fact employ a scheme and artifice to defraud Christ Church and transfer wealth from Christ Church to JPMorgan through the use of toxic, unsuitable investments that were doomed to fail, all in order to generate substantial income to JPMorgan.

258.   JPMorgan has demonstrated a pattern and practice of placing its financial interests before others.

259.   JPMorgan orchestrated a plan to ensure that its revenues in asset management would dramatically increase in order to compensate for its loss of income in traditional banking activities.

260.   As previously described, JPMorgan made multiple false statements to and concealed material information from Christ Church in connection with the offer, sale, and purchase of securities in the Christ Church account.

261.   JPMorgan has engaged in a course of business that operated to defraud or deceive Trust clients and beneficiaries including Christ Church.  This course of business included JPMorgan's concealed "guided architecture" platform, the multiple hidden, embedded fees, its development of toxic investments that were failed to doom to the detriment of the Trusts, and its acceptance of revenues from third-parties to push their products.

262.   As a result of JPMorgan's actions, Christ Church has been damaged.

## Count IV
## SEC Rule 10b-5 Violations

263.   The allegations contained in paragraphs 1 through 262 contained in this Complaint are incorporated herein by reference.

264.    Pursuant to authority granted under §10(b) of the Securities Exchange Act of 1934, the U.S. Securities & Exchange Commission ("SEC") promulgated Rule 10b-5, codified at 17 C.F.R. 240.10b-5.  The rule prohibits any act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.

265.    JPMorgan directly and indirectly, employed a device, scheme, or artifice to defraud Christ Church.

266.    Christ Church and the Christ Church Trusts are persons as defined by law.

267.    The purchase and sales of JPMorgan proprietary and affiliated products were affected by means and instrumentality of interstate commerce including the mails, wires, and national securities exchanges.

268.    JPMorgan's knowing misstatements and omissions of fact were in connection with the purchase or sale of a securities on behalf of the Church Trusts.

269.    Christ Church relied upon JPMorgan to disclose all truthful, relevant, material, and complete information to the Church regarding the investments purchased by JPMorgan for the Church Trusts accounts.

270.    Christ Church's reliance upon JPMorgan caused injury to Christ Church.

## Count V
## Breach of Fiduciary Duty

271.    The allegations contained in paragraphs 1 through 270 contained in this Complaint are incorporated herein by reference.

272.    JPMorgan owed fiduciary duties to Christ Church.

273.    As described above, JPMorgan breached its fiduciary duty to Christ Church by acting in its own interest rather than the Church's.

274.    As a result of its breach of fiduciary duties, JPMorgan has harmed Christ Church.

49

## RELIEF REQUESTED

WHEREFORE, Christ Church respectfully requests this Court to order JPMorgan Chase Bank, N.A. to pay to Christ Church to all compensatory, punitive, and statutory damages allowed by law; interest, reasonable attorney fees and costs, and any other relief that the Court deems appropriate.

Respectfully submitted,

Linda L. Pence, Atty No. 13198-49
David J. Hensel, Atty No.: 15455-49
Julie Smith, Atty No. 27351-71
PENCE HENSEL LLC
135 N. Pennsylvania Street, Suite 1600
Indianapolis, IN 46204
Telephone: (317) 833-1111
Facsimile: (317) 833-1199

*Attorneys for Petitioner*
*Christ Church Cathedral*