UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE RECTOR WARDENS AND VESTRYMEN OF CHRIST CHURCH CATHEDRAL OF INDIANAPOLIS, | ) ) ) ) | |
| Plaintiff, | ) ) | Cause No.: 1:14-CV-1331 LJM/MJD |
| v. | ) ) ) | |
| JPMORGAN CHASE AND COMPANY and JPMORGAN CHASE BANK, N.A., | ) ) ) | |
| Defendants. | ) | |

## CHRIST CHURCH CATHEDRAL'S OPPOSITION TO JPMORGAN'S MOTION TO DISMISS

### I.     INTRODUCTION

On August 13, 2014, Plaintiff Christ Church Cathedral ("Christ Church" or the "Church") filed a five-count complaint against Defendants JPMorgan Chase & Co. ("Parent") and JPMorgan Chase Bank N.A. ("Bank") (collectively "JPMorgan") arising out of a sophisticated and insidious scheme to defraud Christ Church which embraced massive self-dealing between the Parent, its two major subsidiaries (the Defendant Bank and JPMorgan Securities, LLC) and other JPMorgan subsidiaries who created, offered, and sold improper proprietary financial products to two trusts created by Eli Lilly ("Mr. Lilly") for the benefit of Christ Church (the "Church Trusts" or "Trusts").

The Complaint sets forth extensive facts establishing that the Defendants engaged in the intentional mismanagement of and self-dealing in the Church Trust accounts by selling high-risk, high-cost, opaque, unsuitable, and poorly performing financial products to the Church in order to further JPMorgan's own financial interests.

In furtherance of this fraudulent scheme, JPMorgan made fraudulent misrepresentations to the Church including their self-described "superior" investment management and due diligence prowess, the high quality and performance of their proprietary investment products, and the reasonableness of their fees.  JPMorgan concealed from the Church the presence of widespread and profound conflicts of interests, its "guided architecture" program which was designed to increase the sales of its own products, its pressure upon employees to steer clients to JPMorgan products, and the exorbitant revenues received by JPMorgan as a direct result of their fraud.

On October 7, 2014, JPMorgan moved to dismiss four of the five counts leaving only Count II (breach of trust), warning that it would seek to dismiss the breach of trust count as well because "most if not all of the Church's claims for breach of trust are barred by the two-year statute of limitations." Defendant's Brief in Support of Its Motion to Dismiss at 6, fn. 2 ("Def. Br.") (Filing No. 16 at ECF p. 15).[1]

## II.    SUMMARY OF ARGUMENT

JPMorgan requests that this Court dismiss the following claims:   Count I (constructive fraud), Count III (Indiana Securities Act), Count IV (U.S. Securities Act of

---

[1] According to JPMorgan, once the court has ruled on "its motion to dismiss and the automatic stay of discovery under the federal securities laws is lifted, limited discovery relevant to the statute of limitations issue will enable the parties and the Court to determine what, if any, trust investments the Church may still be able to challenge and therefore will significantly reduce (if not avoid entirely) discovery and proceedings on the merits."  Def. Br. at p. 6 (Filing No. 16 at ECF p. 15)

Rest assured that the Church wholeheartedly disagrees.  There is a six year statute of limitations for fraud and regardless of whatever statute of limitations is determined to be applicable, there are multiple grounds for tolling of any statute of limitations based upon JPMorgan's conduct.  In fact, concealment and injuries resulting from JPMorgan's conduct continues today.  Although JPMorgan is no longer trustee, the Church is still stuck with two JPMorgan created off-shore private investments from which JPMorgan will continue to receive fees from Christ Church through 2023.  See Complaint ¶¶ 155, 165, 174, 178. (Filing No. 1 at ECF p. 31, 33-35)

JPMorgan's intention to "limit" discovery is not unexpected.  It has been unwilling to produce documents to Christ Church which will confirm its fraud and other willful misconduct.

1934 and SEC Rule 10(b)(5)), and Count V (breach of fiduciary duty).   Further, Defendant JPMorgan Parent requests that it be dismissed from the lawsuit entirely.   A summary of JPMorgan's position and Christ Church's response will be first summarized below followed by a discussion of the applicable law.

A. <u>CONSTRUCTIVE FRAUD</u>

According to JPMorgan, Count I (constructive fraud) requires dismissal because the complaint does not sufficiently plead fraud with particularity as required by Rule 9(b).   However, Christ Church's Complaint is chocked full of facts describing JPMorgan's scheme to defraud the Church in great detail and in full compliance with Rule 9(b) and applicable case law.   The Complaint was filed after a thorough investigation which revealed substantial evidence supporting plaintiff's allegations and claims.   Further, JPMorgan's insinuation that it does not have enough particulars relating to its alleged scheme to defraud Christ Church is not persuasive since it controls and possesses the information that it claims is missing from the Complaint.

JPMorgan also asserts that since Mr. Lilly granted the trustee, and only the trustee, absolute authority to purchase any investments it deemed appropriate, the Church cannot establish "reliance" (an element of constructive fraud) based upon JPMorgan's false statements or omissions.   If, as JPMorgan asserts, when a trustee possesses sole authority to buy and sell assets, a beneficiary could never establish reliance, and it would be impossible to hold a trustee accountable for fraud.   Under JPMorgan's theory, a trustee could literally deposit all funds in a failing enterprise owned by itself, lose all the trust's value, and never be accountable for fraud.   Further, the basic premise of this argument – that Mr. Lilly provided the trustee with absolute

control and discretion to purchase any product it deemed appropriate – is fundamentally flawed.  Mr. Lilly's Will and applicable state law does not so provide.

All that is required by a plaintiff to allege a constructive fraud claim is the existence of a fiduciary relationship.  Once the relationship has been established, reliance is presumed by law.  The very essence of the relationship between a trustee and beneficiary is one of reliance.  By law, a trustee is required to act always in the best interests of the beneficiary, not itself, and the beneficiary is required to rely upon the trustee.  Omissions of fact by their very nature require a court to presume reliance.  Otherwise, how could any beneficiary ever prove reliance based upon something that has been withheld?

The purpose of the element of reliance in establishing fraud is to ensure that there is a nexus between the false statements or omissions of fact and the injury.  It cannot be disputed that false and fraudulent statements and omissions by a trustee to a beneficiary relating to the trustee's sole duty – to manage the trusts which support the beneficiaries very existence – are not only material but establish a nexus to the injury resulting therefrom.

### B.  THE SECURITIES CLAIMS

JPMorgan requests dismissal of the private securities claims set forth in Count III (Indiana Securities Act) and Count IV (Section 10(b) of the U.S. Securities Act of 1934, 15 U.S.C. 78j(b) and Rule 10b-5, 17 (FR § 240.10b-5) (hereinafter "§ 10(b)").  Under federal law, a private securities lawsuit may only be initiated by a purchaser or seller of a security.  JPMorgan argues that because Christ Church is not the actual purchaser – JPMorgan is – the Church lacks standing to bring a private action under the federal securities law.  As will be discussed, there is some authority supporting JPMorgan's

claim that the trustee is the actual purchaser, not the beneficiary, however, these cases have involved an arms-length transaction with a third-party in the connection with a sale or purchase of a security.  There is also contrary authority recognizing that the real party in interest and thus, the actual purchaser, is the beneficiary.  Under Indiana law, the trustee holds legal title to the trust property but the beneficiary holds equitable title – thus, both could be deemed purchasers.  In this case though, which is quite different than any case cited by JPMorgan, JPMorgan is the creator, offeror and seller, as well as an admitted purchaser, of the financial products at issue, subjecting it to liability based upon its multiple roles and scheme to defraud the Church.  This is not the situation where a trustee is engaged in an arms-length transaction with a third-party.  JPMorgan is both the buyer and seller, and the only one benefitting from the securities transactions.

In addition, JPMorgan argues that the Church's Complaint does not meet the higher pleading standards relating to scienter required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. 78u-4(b).

Christ Church has no concern about meeting whatever standard of pleading is required and believes that federal securities laws apply to its claims.[2]  However, PSLRA

---

[2] It has been reported, and Plaintiff's investigation has confirmed, that JPMorgan is under investigation by the U.S. Securities and Exchange Commission for steering clients to its own proprietary products.  See *JPMorgan's Fund Choices for Clients Said Under SEC Review*, M. Moore, Aug. 8, 2014, Bloomberg, http://www.bloomberg.com/news/2014-08-08/jpmorgan-s-fund-choices-for-clients-said-under-sec-review.html  It has also been reported that the Office of the Comptroller of Currency warned the Bank had wrongfully steered clients into in-house investment products.  Supposedly OCC examiners concluded that the Bank failed to comply with restrictions on sales of in-house financial products and its obligations to retirement plan investors under the Employee Retirement Income Security Act.  See American Banker Magazine, J. Haverty, *JPMorgan Warned by OCC of Asset Management Conflicts*, Jul. 5, 2013.

FINRA continues to issues warnings regarding the suitability of structured notes as well.  In its annual letter that highlights significant risks and issues for investors, FINRA stated that structured products "represent a risk to retail investors who do not fully understand the credit risk exposure they are taking (i.e., these are unsecured investments), the illiquidity of those investments, the derivative features that

also requires a stay of discovery while a federal securities claim is pending and the Church wants to commence discovery which will likely reveal other claims and additional defendants.   In addition, the Indiana Securities Act is broader and provides the same or more relief.   Thus, Christ Church has filed a notice of voluntary dismissal of Count IV (the federal securities claim) without prejudice, pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.

Count III, Plaintiff's claim under the Indiana Securities Act ("ISA"), is well pleaded and should not be dismissed.   JPMorgan's assertion that the Church lacks standing since it was not the actual purchaser lacks merit.   Christ Church disagrees with the JPMorgan's basic premise that the Church was not the purchaser.   Christ Church's, not JPMorgan's, money was used to purchase the financial products created, offered and sold by JPMorgan entities.   Unlike federal private action claims which may be initiated only by purchasers or sellers of securities, the ISA recognizes a cause of action for the "offer, sale and purchase" of a security.   Under the circumstances of this case, JPMorgan is the offeror and seller of the financial products to Christ Church in addition to JPMorgan's admitted role as purchaser.

JPMorgan's multi-sided participation renders the transactions suspect and deserving of special scrutiny under Indiana law.   Indiana courts have long recognized the dangers in allowing a bank trustee to act as both buyer and seller, citing the "great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity" and have cautioned about "the probability in

---

may be embedded in some products, and the uncertainty around the valuation of these products and their associated cash flows." *FINRA Annual Letter*, p. 2, January 2, 2014,
https://www.finra.org/web/groups/industry/@ip/@reg/@guide/documents/industry/p419710.pdf

many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty." *Terre Haute Trust Co. v. Scott*, 181 N.E. 369, 374 (Ind. Ct. App. 1932), quoting from *Michoud v. Girod*, 45 U.S. 503, 4 How. 503 (1846).  The law "prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account." *Michoud*, 45 U.S. at 555.  A trustee is not allowed "to unite the two opposite characters of buyer and seller, because his interests when he is the seller or buyer on his own account are directly conflicting with those of the person on whose account he buys or sells." *Id.*

## C.   BREACH OF FIDUCIARY DUTY

According to JPMorgan, Count V should be dismissed since it is duplicative of Count II (breach of trust).  Christ Church agrees that both counts seek similar relief and therefore has likewise filed a notice of dismissal relating to this Count V as well.

## D.  LIABILITY OF PARENT

Finally, JPMorgan requests that the Court dismiss the Parent as a defendant since it was not the trustee and a parent cannot be liable for the acts of its subsidiaries.  That is not a correct statement of the law.   A parent who controls or directs its subsidiary is liable for that subsidiary's tortious conduct.

Parent JPMorgan is properly a defendant based upon several grounds:  (a)  its own direct actions and participation in the scheme to defraud Christ Church; (b) its assistance to the Defendant Bank in its breach of trust (the law recognizes that those assisting a trustee in the breach of its trust and its fiduciary duties are liable to the beneficiary as well), (c) its aiding and abetting the Defendant Bank to violate Indiana law

and (d) for causing multiple other JPMorgan subsidiaries to participate in the scheme to defraud Christ Church and aid and abet the Bank to breach its trust.

### III.      FACTS

In his Will dated May 29, 1973, Mr. Lilly left a substantial portion of his estate in three separate trusts for the benefit of Christ Church to be managed by three Indianapolis banks which no longer exist.  Complaint, ¶¶ 34 – 36, Ex. A. (Filing No. 1 at ECF p. 8, Filing No. 1-1 at ECF p. 10-11).

At that time, banks had separate trust departments which were conservative and required to adhere to very strict guidelines in each trust's management.  Complaint ¶¶ 38-39 (Filing No. 1 at ECF p. 9).[3]  Mr. Lilly's Will directed each trustee to invest and reinvest property and to regularly distribute income to Christ Church for the purpose of allowing the Church to carry out its religious, charitable and educational purposes. Complaint Ex. A (Filing No. 1-1 at ECF p. 11).

The Will proclaimed that the trustee would be liable for any losses in value to the trusts "in the event of a willful breach of trust."  Complaint Ex. A (Filing No. 1-1 at ECF p. 12).  As typical at that time, the trustee had some authority to invest in property owned or related to the trustee that might be deemed a potential conflict of interest – that was, the "stock of the Trustee Bank, or the stock of any corporation owning the stock of said Bank."  Complaint Ex. A (Filing No. 1-1 at ECF p. 12).  Again, conservative and appropriate investments – bank stock was subject to market valuation, transparent, readily marketable, and typically produced decent and reliable dividends.

---

[3] It is proper and appropriate to review banking practices at the time the Will was created.  A trust instrument should be construed in light of the facts and circumstances existing at the time the instrument was executed.  *Malachowski v. Bank One*, 590 N.E.2d 559, 566 (Ind. 1992).

Nowhere in his Will did Mr. Lilly authorize a trustee to engage in self-dealing. Further, bank trust departments did not invest trust funds in proprietary mutual funds, derivatives, structured notes, hedge funds, or private investments. Indeed, they did not exist.

In July 2004, JPMorgan became the new trustee responsible for two of the three original Lilly trusts which totaled approximately $34.6 million. Complaint ¶ 77 (Filing No. 1 at ECF p. 16). From July 2004 through late 2007, JPMorgan made very few changes to the investment portfolio which consisted largely of equities and bonds. Complaint ¶¶ 77-80 (Filing No. 1 at ECF p. 16-17).

On September 17, 2007, JPMorgan representatives met with Christ Church to introduce them to certain financial products that it intended to purchase for the Church Trusts and opined about the significant opportunities to invest in structured notes, derivatives and hedge funds. Complaint ¶¶ 92-96 (Filing No. 1 at ECF p.19).

Between September 2007 and December 2013, JPMorgan created, offered, sold to, and purchased for Christ Church: (a) eighty-eight structured notes where JPMorgan was the sole placement agent; (b) nine off-shore hedge funds all created by JPMorgan; (c) two JPMorgan created off-shore private equity funds committing $1 million of Church funds (which JPMorgan continues to reap income from today); (d) two losing hedge funds sold by a JP Morgan acquired subsidiary, Highbridge Capital Management; and, (e) twenty-five other JPMorgan proprietary mutual funds including funds that not only caused the Church to lose a substantial amount of money but were dissolved based upon their poor performance and JPMorgan's inability sell them to non-captive, intelligent investors. Complaint ¶¶ 10-23 (Filing No. 1 at ECF p. 3-6).

In addition to the Defendant Bank, the Parent's other subsidiaries that profited from the sale of these financial products to Christ Church included, but are not limited to:  JPMorgan Private Securities, Inc., JPMorgan Private Investments, Inc., JPMorgan Investment Management, Inc., JPMorgan Funds Management Inc., JPMorgan Distribution Services, Inc., JPMorgan Asset Management Holdings, Inc., JPMorgan Clearing Corp., and Highbridge Capital Management LLC.  Complaint ¶¶ 45, 125, 207-214 (Filing No. 1 at ECF p. 10, 25, 40).

In order to "sell" these products to its clients, JPMorgan designed a plan to encourage its employees to steer clients to JPMorgan proprietary products manufactured and created by JPMorgan.  Complaint ¶¶ 187-192. (Filing No. 1 at ECF p. 37).  JPMorgan pressured its sales advisors to sell the products and created scorecards which it provided to investment sales staff highlighting the financial products it should guide their clients to purchase.  Complaint ¶¶ 192-199 (Filing No. 1 at ECF p. 37-38). This plan, of course, was concealed from the Church.  Complaint ¶ 200 (Filing No. 1 at ECF p. 38).

It has been said that structured notes are sold, not purchased.  Who would walk into a bank or brokerage and say, "I would like to purchase a structured note with a 'Buffered Return Enhanced NTS linked to Asian Equity Index Basket due 9/26/08 underwritten by JPMorgan,'" but JPMorgan did just that.  Complaint ¶¶ 98-99 (Filing No. 1 at ECF p. 20).  The 88 structured notes sold to the Church are impossible to understand or monitor, not transparent, not marketable, high risk and have been the subject of warnings issued by the SEC.  Complaint ¶¶ 100-103, 201-205 (Filing No. 1 at ECF p. 21).  Further, these structured notes are often subject to retrocession

agreements (i.e. kick-backs from the issuers to the placement agent such as JPMorgan.)[4]   Complaint ¶¶ 104-107 (Filing No. 1 at ECF p. 21-22).

With respect to the nine hedge funds JPMorgan forced upon the Church, JPMorgan itself created each off-shore hedge fund or fund of funds which was managed and administered by JPMorgan Private Investments, Inc.   Complaint ¶¶ 112-125 (Filing No. 1 at ECF p. 22-25).   Unbeknownst to the Church, JPMorgan Securities LLC was a "special limited partner" in some of the funds.   Complaint ¶ 123 (Filing No. 1 at ECF p. 24).

Around 2004, JPMorgan purchased the majority interest in Highbridge Capital Management because JPMorgan wanted to participate in the lucrative hedge fund industry.  Complaint ¶¶ 215-217 (Filing No. 1 at ECF p. 41).  By 2009, JPMorgan owned the entire company.  Complaint ¶ 217 (Filing No. 1 at ECF p. 41).  It turned out to be a very poor investment for JPMorgan and particularly bad for JPMorgan trust clients. Complaint ¶ 219 (Filing No. 1 at ECF p. 41).   Independent investors were selling off their interests because of poor performance. The only way many of the Highbridge funds continued to exist was by JPMorgan forcing its clients, including Christ Church, into purchasing the poorly performing funds.  Complaint ¶¶ 218-219 (Filing No. 1 at ECF p. 41).  The Church, of course, lost money from these financial products as well.   After

---

[4] The structured notes purchased by JPMorgan for the Church Trusts from itself as placement agent were issued by banks including Barclay's, HSBC, and Credit Suisse.  As has been widely reported, and publicly acknowledged by JPMorgan, JPMorgan and these banks are undergoing criminal and civil investigations in Europe and the United States for engaging in a massive fraudulent scheme to manipulate the price of various currencies – including currencies which are contained in the some of the "baskets" of the structured notes sold to Christ Church.  *See, 4 Banks, Including JPMorgan Fined in Europe Over "Cartel" Behavior*, October 21, 2014, New York Times, http://dealbook.nytimes.com/2014/10/21/4-banks-including-jpmorgan-fined-in-europe-over-cartel-behavior/?_php=true&_type=blogs&_r=1   Prior to filing the complaint, Christ Church requested that JPMorgan produce information regarding the agreements with these issuers to serve as placement agent for their notes.  That information was not produced.

tying up $1.844 million of Church Trust monies in two Highbridge funds for 2 ½ years, the Church lost $95,000 in principal. Complaint ¶¶ 221-223 (Filing No. 1 at ECF p. 42).[5]

JPMorgan also sold multiple proprietary mutual funds to the Church as well, including funds that were toxic and doomed to failure.  Complaint ¶¶ 186, 206 (Filing No. 1 at ECF p. 37, 39).  Multiple examples of these losses are referenced in the complaint including the loss of $781,000 from three JPMorgan funds which were ultimately dissolved.  Complaint ¶¶ 111, 207-214 (Filing No. 1 at ECF p. 22, 40).

In 2011 and 2012, Christ Church questioned JPMorgan about the total revenues it was receiving from the investment products in the Trust's portfolio including revenues received by any JPMorgan entity.  Complaint ¶ 152 (Filing No. 1 at ECF p. 31).  Rather than respond with complete, accurate, quantitative amounts, the Church received limited explanations of fees and carefully worded explanations relating only to a portion of the fees and costs received by the Defendant Bank alone, not other JPMorgan entities.  Complaint ¶¶ 18, 152-154 (Filing No. 1 at ECF p. 5, 31).[6]

---

[5] It could be said that Christ Church was lucky that it only lost $95,000 as a result of the $1.844 million investment.  As the Complaint notes, another beneficiary of a trust managed by JPMorgan, the Parlin-Ingersoll Public Library, Canton, Illinois, suffered a loss of $254,000 from an investment of $750,000 in a Highbridge fund.  Complaint ¶¶ 228-232 (Filing No. 1 at ECF p. 43).

[6] In its brief, JPMorgan asserts that the compensation it received is of no relevance to this case, because there is no duty to provide transaction costs or to disclose compensation in the sale of securities.  Def. Br. 22. (Filing No. 16 at ECF p. 31.)  Citing *Spears v. Metro. Life Ins. Co.,* 2009 WL 2408928, (N.D. Ind. 2009), JPMorgan claims that normal compensation or the incentive to increase corporate profits are common business practices, cannot serve as the basis of a security claim, and a brokerage has no duty to describe such information.

*Spears* has no relevance here.  A trustee is required to disclose to the beneficiaries in writing information about all compensation in any transaction where the bank and its affiliates are receiving income in connection with the purchase, sale, service, or administration of each security.  Complaint ¶¶ 62, 65 (Filing No. 1 at ECF p. 13, 14).  *See also,* Indiana Code § 30-4-3-6 requires a trustee to provide to the beneficiary complete and accurate information concerning any matter related to the trust and allow the beneficiary to inspect all documents concerning the administration of the trust.  Fiduciaries are always entitled to an accounting.  *Cincinnati Life Ins. Co., v. Grottenhuis,* 2011 WL 1107114 (S.D. Ind. 2011).

In January and February, 2012, JPMorgan sold two private equity fund financial products to the Church, committing $1 million in two high-risk, high-cost, illiquid private equity conduit funds created by JPMorgan obligating the Church to continue to pay monies to the JPMorgan funds until at least 2023.  Complaint ¶ 155 (Filing No. 1 at ECF p. 31).  These two investments have absolutely no place in a Church portfolio – they are illiquid, not transparent, not marketable, subject to multiple conflicts of interests, and high risk.  Indeed, as the prospectuses and subscription agreement make clear, a potential investor should be prepared to lose all of the investment. Complaint ¶¶ 156-178 (Filing No. 1 at ECF p. 31-35).

JPMorgan concealed significant information from the Church relating to these two products including offering memoranda and the subscription agreements. Complaint ¶¶ 163, 166, 169 (Filing No. 1 at ECF p. 32, 33).  On March 8, 2012, JPMorgan sent a letter to the Church, welcoming Christ Church as an investor in "KKR NS XI Private Investors Offshore, L.P., a JPMorgan conduit fund administered by JPMorgan Private Investments, Inc." ("KKR").  Complaint ¶ 162 and Ex. F (Filing No. 1 at ECF p. 32 and Filing No. 1-6 at ECF 1-2).  The signature page of the subscription agreement was the only page attached to the letter.  This agreement binds Christ Church to a $500,000 commitment and additional substantial fees which would be paid to JPMorgan until 2023. Complaint Ex. F (Filing No. 1-6 at ECF p. 1-2).   Christ Church never received the full subscription agreement.  However, the last page of the agreement alone is truly remarkable.

Some JPMorgan employee identified in manual printing as "Matthew Crenshaw, Portfolio Manager," signed on behalf of the "Limited Partner (Investor)," Church Trusts,

falsely claiming that the Church Trusts had read and understood the subscription agreement and its multiple warnings. Complaint ¶ 165 (Filing No. 1 at ECF p. 33).  Mr. Crenshaw, if he exists, did not even sign the subscription agreement.  Instead there is a computer-generated robo-signature bearing no resemblance to anyone's name, including Mr. Crenshaw's.  Complaint ¶ 164 (Filing No. 1 at ECF p. 32-33).  For some unknown reason (since the Church still does not have the complete subscription agreement) Mr. Crenshaw, as the JPMorgan portfolio manager, checked the category stating that "the undersigned is not an employee or director of JPMorgan or the spouse, domestic partner, minor a child and/or financial dependent of an employee or director (a "Related "Person")."   The signature page was also signed by JPMorgan Private Investments, Inc. as administrator of the off-shore entity.  Complaint Ex. F (Filing No. 1-6 at ECF p. 1-2).

There is no doubt that JPMorgan injured the Church.  As the Complaint makes clear, JPMorgan's performance was dismal and caused an estimated loss of value in principal to the Church Trusts of $13 million. Complaint ¶¶ 10-22 (Filing No. 1 at ECF p. 3-5).

Unlike the Church Trusts, JPMorgan thrived during the same period.  While the Church lost money, JPMorgan reported that from 2004 through 2013, its net revenues increased from $43 to $96.6 billion and its assets grew a whopping $1.4 trillion in additional values. Complaint ¶ 21 (Filing No. 1 at ECF p. 5).  According to a 2014 corporate overview to shareholders, JPMorgan earned $1.1 billion in revenues from cross-selling its proprietary products to its clients.  Complaint ¶ 22 (Filing No. 1 at ECF

p. 5).[7]   In fact, there were financial products sold to Christ Church where JPMorgan made more money than the Church.  Complaint ¶¶ 19, 205, 214, 223.  (Filing No. 1 at ECF p. 5, 39, 40, 42).

## IV.     LEGAL DISCUSSION

### A. STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chic. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  In ruling on a motion to dismiss under Rule 12(b)(6), the Court construes the complaint "in the light most favorable to the nonmoving party, accept[ing] well-pleaded facts as true, and draw[ing] all inferences in [their] favor."  *Reger Dev. LLC v. Nat'l City Bank*, 592 F.3d 759, 763 (7th Cir. 2010).  "To survive a motion to dismiss for failure to state a claim, the complaint must overcome 'two easy-to-clear hurdles':  (1) the complaint must describe the claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on which it rests; and (2) its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level."  *Reid v. Unilever United States, Inc.*, 964 F.Supp.2d 893, 904 (N.D. Ill. 2013) quoting from *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008).  Courts assume the veracity of well-pleaded factual allegations.  *Id*.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[7] In its brief, JPMorgan claims that the Church has painted a grossly inaccurate picture of how the Bank managed the Trusts claiming that JPMorgan produced "solid" and even "stellar" returns resulting in the Trusts gaining $10 million between 2006 and 2013 while the Church received distributions of $13 million. Def. Br. 1 (Filing No. 16 at ECF 10).  That takes some nerve.  As the Complaint makes clear, JPMorgan's performance was "solid" and "stellar" with respect to its own interests only, not the Church's.  It was JPMorgan's job, indeed its solemn duty as a trustee, to preserve and improve the principal while making annual distributions to the Church.  But for JPMorgan's misconduct, the Church would be receiving substantially more income per year to use in furtherance of its mission.

reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss, "the plaintiff must give enough details about the subject-matter of the case to present a story that holds together.  In other words, the court will ask itself *could* these things have happened, not *did* they happen."  *Swanson v. Citbank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010).

In deciding a motion to dismiss, the Court may look only at the pleadings, with all well-pleaded material facts alleged in a complaint taken as admitted, supplemented by any facts of which the court takes judicial notice.  *U. S. v. Hope*, 906 F.2d 254, 260 n. 2 (7th Cir. 1990); *Henson v. CSC Credit Svcs.*, 29 F.3d 280, 284 (7th Cir. 1994); *Smith v. Indiana Dept. of Corr.*, 871 N.E.2d 975 (Ind. Ct. App.  2007).[8]

## B.  CONSTRUCTIVE FRAUD

### 1.  The Complaint Comports with Rule 9(b)

JPMorgan requests dismissal of Count I, constructive fraud, claiming that it fails to comply with Rule 9(b) because the Church does "not specify who said what to whom, when, where, how, or why," and "[n]otably, the alleged statements are attributed to 'JPMorgan,' a 'JPMorgan representative' or other unspecified speakers."  Def. Br. at 15 (Filing No. 16 at ECF p. 24).

Federal Rule 9(b) advises that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

---

[8] A court may take judicial notice of matters of public record without converting a motion to dismiss for failure to state a claim into a motion for summary judgment, including proceedings in other courts.  *U.S. v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991); *Limestone Dev. Corp. v. Village of Lamont*, 473 F.Supp. 2d 858 (N.D. Ill. 2007).

The heightened pleading requirement is a response to the great harm to the reputation of a business or person that can result from a fraud claim. *Borsellino v. Goldman Sachs Group*, 477 F.3d 502, 507 (7th Cir. 2006); *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627 (7th Cir. 1990). "The rule requires the plaintiff to conduct a pre-complaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. N.W. Mut. Life Ins. Co.,* 172 F.3d 467, 469 (7th Cir. 1999). The Rule is designed to discourage a "sue first, ask questions later" philosophy and to minimize the risk of extortion that may come from a baseless fraud claim. *Pirelli Armstrong Tire Corp. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). So the complaint should establish "the who, what, when, where, and how" the fraud was perpetrated upon the victim. *U.S. ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 695 (7th Cir. 2005) (quoting *DiLeo V. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

In *Pirelli*, the Seventh Circuit noted, "[i]n adding flesh to the bones of the word particularity, we have often incanted that a plaintiff ordinarily must describe the "who, what, when, where, and how" of the fraud – "the first paragraph of any newspaper story." *Pirelli*, 631 F.3d at 442. But the Seventh Circuit in the same case also cautioned that "because courts and litigants often erroneously take an overly rigid view of the formulation, we have also observed that the requisite information – what gets included in that first paragraph – may vary on the facts of a given case." *Id.* at 441-442. Flexibility from pleading requirements may be necessary when information lies outside of the plaintiff's control. *Emory v. Am. Gen. Fin., Inc.,* 134 F.3d 1321, 1324 (7th Cir. 1998). Although "plaintiffs are not absolutely required to plead the specific date, place,

or time of the fraudulent acts," they still must "use some alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Pirelli,* 631 F.3d at 442, quoting from 2 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 9.03 [1] [B], at 9-18 (3d. 2010).

a. <u>Pre-Complaint Investigation</u>

Christ Church did not sue first and ask questions later – but conducted an extensive pre-complaint investigation. In order to prepare the complaint, Christ Church was required to review and analyze ten years (thousands of pages) of monthly account statements relating to multiple accounts issued by JPMorgan which identified the time, place, amount, and actual or estimated value of every transaction conducted by JPMorgan relating to the Church Trusts. Those statements generated by JPMorgan identify the Indianapolis officers and "advisors" handling the Church accounts. The JPMorgan statements do not identify the entities, officers and employees who made the actual buys or sells of securities utilizing the Church's money.

Through a review of documents which Christ Church was able to obtain, it became clear that JPMorgan the Parent was directing multiple subsidiaries to create, offer, sell, and administer proprietary products that the Bank was required to offer and sell to its clients, including Christ Church.

Most of the information needed to plead which subsidiary was responsible for what is in the possession of JPMorgan, not Christ Church. Despite the review of thousands of pages of monthly account statements and financial product prospectuses, the Church does not know which JPMorgan subsidiary was the actual seller of the

questionable proprietary products.   JPMorgan is the custodian of the actual purchase and sale transaction documents.[9]

The Church's pre-Complaint investigation revealed that JPMorgan Indianapolis employees dealing with Christ Church were provided scorecards and lists regarding what they should push to their clients as opposed to any analysis or determination as to what was best for clients. For the most part, it seems that they were simply carrying out orders from unidentified superiors in Columbus, Ohio or New York.[10]

Plaintiff's pre-Complaint investigation included communications with experts and witnesses to learn and understand the nature and mechanics of the JPMorgan proprietary financial products and its sales practices.   As part of this investigation, public records, media reports and witnesses revealed that JPMorgan was under investigation by the SEC and OCC for steering clients to JPMorgan proprietary products and criticism of JPMorgan throughout its industry as to JPMorgan's substantial reliance upon selling

---

[9] JPMorgan argues it was inappropriate for the Church to lump the Parent and the Bank together and not distinguish specifically what each defendant did citing *Ochre LLC v. Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387 (S.D.N.Y. 2012) for the proposition that the lumping of defendants together does not afford each defendant adequate notice of the factual allegations it faces.  But in *Ochre*, there were five separate and unrelated defendants involved in a copyright infringement and various contract claims relating to the design of a luxury chandelier at a Las Vegas hotel including a design firm, architect, owner of a property, a bank, and a procurement agent.  Under those circumstances, a plaintiff should be required to distinguish between the unrelated defendants and advise how each participated in the wrongdoing.   That is not the situation here.   The Parent and the Bank already possess that information – not the Church.  The Church knows that the Bank as Trustee filled its accounts with proprietary products developed by the Parent and sold by other JPMorgan subsidiaries.  The Church looks forward to receiving the actual sales documents, offering documents, and other information to determine exactly which entities actually sold the products through the Bank to the Church Trusts.

[10] Christ Church intentionally did not identify the specific Indianapolis officers and employees who met with Church and determined that do so would be irresponsible. JPMorgan has criticized Christ Church for not identifying the "who" which would necessarily include the specific names of JPMorgan officers and employees in Indianapolis who met with the Church.  First, JPMorgan knows who they are.  Their names are listed on monthly statements and in written presentations provided to the Church.   The Church believes that it would be unfair to publicly identify non-parties in a complaint involving fraud against the Church particularly since some of these individuals were low level employees following orders from others above them who could decide whether they kept their job or received a bonus.  To the Church, it seemed appropriate to treat them in a manner similar to the law surrounding the practices to not identify co-conspirators in an indictment.  See *United States v. Briggs*, 513 F.2d 794 (5th Cir. 1975).

its proprietary products to customers to boost its revenues.   A review of JPMorgan's annual reports for 2004 through 2014 corroborated the fact that its revenues for the cross-selling of its own proprietary products made up for losses of revenue in its traditional banking business.

Finally, the Church also requested JPMorgan to provide information related to its "guided architecture" program, any risk analysis it performed with respect thereto, audits, and suitability reviews of the financial products sold to the Church Trusts.  That information was not produced either.

### b.  The Complaint Adequately Pleads Constructive Fraud

JPMorgan asserts that the Church can never prove constructive fraud because it cannot establish one of the elements of constructive fraud – reliance -- based upon any alleged purchase of a security.   According to JPMorgan, since the Church had no authority to purchase any security, it does not matter whether it was provided with false information or omitted facts.

The Church disagrees with the Defendants' position for a variety of reasons:  (1) all the plaintiff is required to do in its pleading is sufficiently allege the existence of a fiduciary relationship and a scheme to defraud; (2) reliance is presumed as a matter of law; (3) the Church, as a matter of both fact and law, did rely upon, and was entitled by law to rely upon, JPMorgan, as trustee; (4) JPMorgan's attempt to narrowly focus upon each single purchase of a security is misplaced – JPMorgan engaged in a wide-ranging scheme to defraud Christ Church which is not limited to any one single transaction but spanned multiple years involving a complicated transfer of wealth from the Church Trusts to JPMorgan; and, (5) JPMorgan's argument would turn trust and fiduciary law

on its head if a trustee were not accountable for fraud in the discharge of its duties owed to a beneficiary.

Fraud, especially as the word is used in courts of equity, comprises all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damage to another. *Plymate v. Upright*, 419 N.E. 756, 759 (Ind. Ct. App. 1981). Owing to the multiform character of fraud and the great variety of attendant circumstances no definition which is all inclusive can be framed, but each case must be determined on its particular facts." *Id*.

Constructive fraud arises by the operation of law from a course of conduct, which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *In re Rueth Dev. Co*., 976 N.E.2d 42 (Ind. Ct. App. 2012); *In re Bender*, 844 N.E.2d 170, 182 (Ind. Ct. App. 2006). Under Indiana law, a plaintiff's initial burden in pleading a constructive fraud claim is to simply establish a fiduciary-like relationship. Id. "A **presumption of fraud** arises once the plaintiff establishes the existence of a fiduciary relationship." (emphasis added) *In Re Rueth Dev. Co.*, 976 N.E.2d at 52; *In re Bender*, 844 N.E.2d at 282. It is undisputable that such a relationship exists between Christ Church and the Defendant Bank. Trustees have the highest fiduciary duty which exists under Indiana Law. "No relation, guarded with more care and circumspection, is recognized by the law than that of trustee and *cestui que trust*." [11] *Terre Haute Trust Co.*, 181 N.E.2d at 371.

---

[11] A *cestui que* trust is defined as "[h]e who has a right to a beneficial interest in and out of an estate the legal title to which is vested in another. The person who possesses the equitable right to property and receives the rents, issues, and profits thereof; the legal estate of which is vested in a trustee. Beneficiary of trust." Black's Law Dictionary, 5th Ed.

Because the Church adequately pleaded the existence of a fiduciary relationship, **reliance is presumed** as well. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972) ("[P]ositive proof of reliance is not a prerequisite to recovery"); *Grubb v. FDIC*, 868 F.2d 1151 (10th Cir. 1989).  This presumption recognizes the unique difficulty of proving reliance on a failure to disclose material information of which the plaintiff did not know.  *Grubb*, 868 F.2d at 1163; *Holdsworth v. Strong*, 545 F.2d 687 (10th Cir. 1976). An obligation to disclose coupled with the withholding of a material fact establishes the requisite element of causation.  *Affiliated Ute Citizens of Utah*, 406 U.S. at 154.

Thus, at this pleading stage, plaintiff has met its burden.  It is clear from the allegations that both as a factual and legal matter – Christ Church did rely upon JPMorgan.  The Bank, as Trustee, advised the Church that it fully understood its legal duties to act in the Church's best interests.   Complaint ¶¶ 86-87.  At no time, did JPMorgan advise the Church of its massive scheme to defraud which is set forth in great detail throughout the Complaint.

In addition, the law recognizes that a beneficiary is entitled to, and must rely upon a trustee.  In *Malachowski v. Bank One*, the Indiana Supreme Court examined whether a beneficiary's reliance upon a trustee, Bank One, was reasonable. 590 N.E.2d at 564.  The court held that "the notion that the Beneficiaries were not entitled to rely upon the good faith of Bank One but were instead under some duty to be suspicious of Bank One's activities and to investigate whether Bank's One's representations were true, 'would seem to undercut the very essence of the trust relationship.'" *Id*. (quoting

from Judge Sullivan's dissenting, in part, Court of Appeals decision below in that case *Malachowski v. Bank One*, 570 N.E.2d 65, 69 (Ind. Ct. App. 1991)).

Similarly, in *Wilbur v. Keybank Nat'l Ass'n*, the court, when ruling upon the beneficiaries' constructive fraud law claim, held that a beneficiary is entitled to rely upon a trustee. 962 F.Supp. 1122 (N.D. Ind. 1997).  Citing *Malachowski*, the court ruled that "the entire concept of a trust*ee* is based upon the notion that a trustee is one who can be 'trusted.'  Thus, it would logically follow that a beneficiary should be able to rely on a trustee's advice, statement or opinion with regard to the administration of a trust." *Id*. at 1129.

If the Church had been provided with truthful and complete information about the nature of JPMorgan's wide-ranging scheme to defraud the Church, it would have been able to seek the Defendant's removal long before the extensive damage occurred in the Church Trusts portfolio caused by the Defendant's massive self-dealing.

## C. <u>THE INDIANA SECURITIES CLAIM</u>

Count III of the Complaint arises out of the Indiana Securities Act. Ind. Code § 23-19-5 *et. seq*.  Under Section 1 of the Indiana statute, it is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:

(1)   to employ a device, scheme, or artifice to defraud;

(2)   to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or

(3)   to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

I.C. 23-19-5-1.

As the Complaint makes clear, JPMorgan is liable to the Church based upon all three separate roles it assumed in carrying out its scheme to defraud Christ Church and its engagement in a practice and course of business that operated as a fraud or deceit upon Christ Church.  JPMorgan was the **offeror** of over a hundred separate securities it created as part of its scheme and artifice to defraud for the purpose of surreptitiously transferring wealth from Christ Church to JPMorgan. The mere offer of these securities to the Church was in violation of this statute since they "would have operated as a fraud or deceit upon another person."   JPMorgan and its multiple subsidiaries were the **sellers** of these unsuitable securities.   JPMorgan was also, as it claims to be, the **purchaser** of these securities.   Under Indiana law, this massive self-dealing alone establishes an unlawful course of business since a trustee is now allowed to unite the two opposite characters of buyer and seller.  *Terre Haute Trust Co.,* 181 N.E.2d at 374.

According to JPMorgan, this Court should dismiss the ISA claim, advising that because JPMorgan, not Christ Church, was the purchaser of the hundreds of securities found in the Church accounts, the Church lacks standing to file a private action. JPMorgan begins by acknowledging that there is no Indiana authority specifically interpreting the provision at issue, Ind. Code § 23-19-5-1. Def. Br. 12 (Filing No. 16 at ECF 21).  Then it argues that this Court should follow federal authority when interpreting the Indiana statute. *Id*.

First, under the federal statute, which is not as broad, the Church's claims would survive because the Church, holds equitable title and is the real-party in interest who was injured.   Second, JPMorgan created and sold the securities as part of a fraudulent scheme directed at Christ Church.  Certainly, the Church would have standing in that

instance.  The purpose of standing is to ensure that the plaintiff has a personal stake in the outcome sufficient to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult questions.  *Baker v. Carr*, 369 U.S. 186, 204 (1962); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 583 (1992).  Defendant Bank did not, and would not, sue its Parent.  The Defendant Bank was under the control of the Parent and intentionally participated in JPMorgan's scheme to defraud the Church.  The only party with a personal stake in the outcome is the Church.

Significantly, JPMorgan's reasoning fails to recognize the critical difference between the state and federal securities statutes.  While it is true that both statutes use the "in connection with" language, Indiana's statute regulates "the ***offer***, sale, or purchase of a security" while the federal statute regulates "the purchase or sale of any security."  Ind. Code § 23-19-5-1, 17 C.F.R. 240 10(b)(5) (emphasis added).

The inclusion of the word "offer" in Indiana's statute is particularly important given the reasoning in the federal cases.  In 1975, the U.S. Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), formally adopted what is known as the *Birnbaum* rule that the plaintiff class for purposes of a § 10(b) private action was limited to actual purchasers and sellers of securities, not offerees.  *See, Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2nd. Cir. 1952), cert. denied, 343 U.S. 956 (1952).  In *Blue Chip Stamps*, the plaintiff did not accept an offer to purchase a security because of a materially misleading overly pessimistic prospectus.  The Court noted that a federal private securities claim under § 10(b) was limited only to the purchasers and sellers of stock, not offerors. *Blue Chip Stamps*, 421 U.S. at 754.  The purchaser-seller rule was

intended to ensure that private actions be bought only by those persons whose active participation in the marketing transaction promise enforcement of the statute without undue risk of abuse of the litigation process and without distorting the securities market. *Id.* at 739.  "The virtue of the Birnbaum rule … is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates," thereby resulting in objective demonstrable claims.  *Id.* at 747.

Utilizing the *Birnbaum* rule, JPMorgan asserts that Christ Church cannot bring a private securities fraud claim under the Indiana statute because it was not the actual purchaser.[12]  However, cases since *Birnbaum* and *Blue Chip Stamps* have found that Courts should read § 10(b) flexibly, not technically. *Grubb,* 868 F.2d at 1163. *See also, Superintendent of Ins. v. Banker's Life & Cas. Co.*, 404 U.S. 6, 12 (1971); *Windon Third Oil & Gas Drilling P'ship v. FDIC*, 805 F.2d 342, 346 (10th Cir. 1986) *cert. denied*, 480 U.S. 947 (1987).  The remedial purpose of the rule should not be defeated by taking a technical, unrealistic view of what happened in a case. *Grubb*, 868 F.2d at 1162.  In reality, the Church was, at minimum, the equitable purchaser of the securities – it was the Church's money that financed the transaction.

In *Hackford v. First Sec. Bank of Utah, N.A.*, 521 F.Supp. 541 (D. Utah 1981) the trustee bank contended that the plaintiff trust beneficiaries lacked standing to bring a § 10(b) action since the trustee bank, not the beneficiaries, sold the stock to a third party.  The Court rejected the bank's argument that the beneficiaries were neither buyers or sellers to which standing was limited by the U.S. Supreme Court in *Blue Chip Stamps*:

---

[12] JP Morgan's position is contrary to its actions.  In March 2012, JP Morgan, by letter, acknowledged that Christ Church was the investor in KKR.  *See* Complaint ¶ 161, Ex. F (Filing No. 1-6 at ECF p. 1-2).

> While the trust beneficiaries did not perform the mechanics of the sale of their stock, they were not bystanders contemplated by *Blue Chip*. They are separate from the public at-large. It was stock in which they had a beneficial interest which was sold. If any fraud occurred as to them, it was they who would feel the impact, not the trustee "seller."

521 F.Supp. at 549.

In *Heyman v. Heyman*, 356 F.Supp. 958, 966 (S.D.N.Y. 1973), the Court found that the beneficiary of a trust funded by the sale of shares was found to have standing since "although not the seller, she was one who immediately stood to gain or lose by the sale; it was for her benefit" that the sale was made. "In § 10(b) cases, courts should not be loath to look behind the legal technicalities of a transaction in order to protect those whose interests the statute was designed to safeguard." *Id*. at 965.

Several other courts have held that despite the seemingly bright-line rule established by *Blue Chip Stamps* and asserted by JPMorgan, shareholders of "holding companies" created solely to purchase stock in another company, have standing to bring an action under § 10(b). *Levenfeld v. Boyd*, 2003 WL 22532801 at *4 (N.D. Ill. 2003).

Christ Church, similar to holding companies that have been granted standing to bring a securities claim, has standing to assert its claim. First, the Trusts were created for the sole purpose and benefit of Christ Church and its trust corpus are intended to be in perpetuity. Second, JPMorgan created and initiated all of the transactions, including the selection of every single structured note, hedge fund, private investment and proprietary mutual funds. Third, all of the misrepresentations were made or omitted prior to JPMorgan "selecting" the investment. For example, JPMorgan made false claims regarding the fees and suitability of structured notes and hedge funds to the

Investment Committee prior to purchasing the securities for the Trust.   Fourth, the Church's money, not JPMorgan's, was at risk in the transactions.   Sixth, the damages the Church seeks are real and not speculative.   Finally, this is not the type of lawsuit that caused the Supreme Court's concern in *Blue Chip Stamps*.   It is not a class action. It is not a strike suit filed in order to extort a settlement.   It is not a speculative claim such as a claim that a plaintiff would have purchased certain securities being offered if it had been provided material information.   This case involves JPMorgan's self-dealing in securities which caused actual, quantifiable harm to the Church.   The Supreme Court has never addressed a case as to whether a § 10(b) private action could be brought by a beneficiary against a trustee who was both the buyer and seller of securities pursuant to a scheme to defraud the beneficiary.   Plaintiff has no doubt that such a private action would indeed be recognized.

## D.  JPMORGAN PARENT IS A PROPER DEFENDANT

JPMorgan requests that the Parent be dismissed as a Defendant from this lawsuit, leaving only the Bank as the sole defendant.   Citing *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1988), JPMorgan advises that "it is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation is not liable for the acts of its subsidiaries."   Def. Br. at 27 (Filing No. 16 at ECF p. 36).   That, however, is not a complete summary of the law.   In *Bestfoods*, the Supreme Court also advised that "there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well, which recognizes that the corporate veil may be pierced and the parent corporation held liable when the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the parent's behalf."   *Id*. at 62.

A parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful conduct. *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 756 (7th Cir. 1989). A parent who controls a subsidiary can be found liable for the subsidiary's acts particularly when the parent company is actually transacting business in the forum through the subsidiary. *In re: Vitamins Antitrust Litigation*, 270 F.Supp.2d 15, 21 (D.C. 2003).

It is the law in Indiana that a third party, who has aided and abetted the trustee in carrying out the fraudulent scheme, may be joined as a defendant in the same action against the trustee. *Sharts v. Douglas*, 163 N.E. 109 (Ind. Ct. App. 1928). *See, Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006); *Fifth Third Bank v. Double Tree Lake Estates,* 2014 WL 3659780, (N.D. Ind. 2014).; *Hellums v. Raber*, 853 N.E. 2d 143, 146-47) (Ind. Ct. App. 2006). *See also*, Scott and Fratcher, *The Law of Trusts*, Section 506 (4th ed. 1989) ("When a person in a fiduciary relationship to another violates his duty as fiduciary, a third person who participates in the violation of duty is liable to the beneficiary").

A person is responsible for harm done to a third party from the tortious conduct of another, if he:  (a) acts in concert with another or pursuant to a common design with him resulting in harm to the third party, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other in the breach of that duty. Restatement (Second) of Torts, Section 876; *Hellums v. Raber*, 853 N.E.2d 143 (Ind. Ct. App. 2006); *Boyle v. Anderson Fire Fighters Ass'n,* 497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986).  "Joint liability may also be premised upon independent

acts that combine to produce an injury." *Hellums*, 853 N.E.2d at 146, note 1.  See also *Nance v. Miami Sand & Gravel*, 825 N.E.2d 826, 835 (Ind. Ct. App. 2005).

In this case, the Parent Defendant is the master-mind and director of the fraud perpetrated upon Christ Church by the Trustee Bank.  The Parent created the "guided platform" architecture described in the Complaint which was designed to steer JPMorgan banking clients, including Christ Church, to a forced purchase of JPMorgan financial products for the benefit of the Parent and to the detriment of Christ Church.

Here, the Parent directly participated in, directed, created, and enforced a policy of steering Bank clients to JPMorgan proprietary products so that it and its multiple subsidiaries would reap substantial profits to the determinant of its clients.  The Parent deserves to be held accountable for its role in orchestrating the scheme to defraud Christ Church. [13]

---

[13] Not only is the Parent an appropriate defendant, but there are likely other tortfeasors as well who could be accountable for the unlawful conduct.  Directors and officers of a trustee bank may be personally liable for a breach of trust.  Scott L. Fratcher, The Law of Trusts, Vol. IV, § 326.3, 303 (4th Ed.).  "The directors and officers are, of course, under duties to the corporation.  But they also owe duties to the beneficiaries of the trusts administered by the corporation."  *Id*. at 304.  Any officer who knowingly causes the corporation to commit a breach of trust causing loss to a trust administered by the corporation is personally liable for the loss to the beneficiaries of the trust.  *Id*. at 305.  It is also no defense in an action brought against the officer by the beneficiary of the trust that the officer did not himself profit through the breach of trust or that his conduct was not dishonest.  *Id*. at 305-306.

JPMorgan Securities sold proprietary products to the Church.  When a stockbroker and brokerage makes purchases and sales of securities for a trust has notice that the trustee is committing a breach of trust in making the purchases or sales, the broker is liable for participation in the breach of trusts.  *Id*. at 296.  "The broker is liable where he has actual knowledge or where the circumstances show that the trustee is committing a breach of trust in making the purchase or sale through the agency of the broker."  *Id*.

## V.      CONCLUSION

Based upon the foregoing, Christ Church requests that the Court deny JPMorgan's Motion to Dismiss Count I (Constructive Fraud), Count III (Indiana Securities Act), and the dismissal of Defendant Parent, JPMorgan Chase and Company.

Respectfully submitted,


_/s/ Linda L. Pence_
Linda L. Pence, Atty No. 13198-1
David J. Hensel, Atty No.:  15455-49
Julie Smith, Atty No. 27351-71
Pence Hensel LLC
135 N. Pennsylvania Street, Suite 1600
Indianapolis, IN  46204
Telephone:  (317) 833-1111
Facsimile:    (317) 833-1199

_Attorneys for Plaintiff,_
_Christ Church Cathedral_

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of December, 2014, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

David K. Herzog
FAEGRE BAKER DANIELS, LLP
david.herzog@faegrebd.com

Paul A. Wolfla
FAEGRE BAKER DANIELS, LLP
paul.wolfla@faegrebd.com

Katrina M. Gossett
FAEGRE BAKER DANIELS, LLP
katrina.gossett@faegrebd.com

Sarah C. Jenkins
FAEGRE BAKER DANIELS, LLP
sarah.jenkins@faegrebd.com


_/s/ Linda L. Pence_____
Linda L. Pence