UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RECTOR, WARDENS, AND VESTRYMEN OF CHRIST CHURCH CATHEDRAL OF INDIANAPOLIS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:14-cv-01331-LJM-MJD |
| vs. | ) ) ) | |
| JPMORGAN CHASE AND COMPANY, *et al.* | ) ) ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Defendants JPMorgan Chase and Company ("Parent") and JPMorgan Chase Bank, N.A. ("Chase") (collectively, "Defendants") have moved to dismiss Count I, which alleges constructive fraud, and Count III, which alleges violation of the Indiana Securities Act ("ISA"), of Plaintiffs Rector, Wardens, and Vestrymen of Christ Church Cathedral of Indianapolis's (the "Church's") Complaint on the merits; Parent has moved to dismiss all Counts against it. Dkt. No. 15. For the reasons stated herein, Defendants' Motion to Dismiss is **GRANTED**, with prejudice in part and without prejudice in part.

## I. MOTION TO DISMISS STANDARD

Under the Supreme Court's directive in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), to survive Defendant's motion for failure to state a claim upon which relief may be granted, the Church must provide the grounds for its entitlement to relief with more than labels, conclusions or a formulaic recitation of the elements of a cause of action. *Id.* at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The Court assumes that all the allegations in the Complaint are true, but the "allegations must be

enough to raise a right to relief above the speculative level." *Id.* The touchstone is whether the Complaint gives Defendants "fair notice of what the … claim is and the grounds upon which it rests." *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Legal conclusions or conclusory allegations are insufficient to state a claim for relief. *McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). The Court may also consider documents attached to the Complaint and documents referenced in the Complaint, as well as take judicial notice of publicly available documents to decide the motion. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Both Counts I and III allege fraud; therefore, they are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 961 (S.D. Ind. 2007). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." To allege fraud with particularity, the Church must allege "the who, what, when, where, and how: the first paragraph of any newspaper story." *United States v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003) (citation omitted).

## II. <u>FACTUAL ALLEGATIONS</u>

The factual allegations in the Complaint follow.

In his Last Will and Testament, Eli Lilly created three trusts for the principle benefit of the Church. Compl. ¶¶ 34-35. The three original trustees were Merchants National Bank & Trust company of Indianapolis, Indiana National Bank, and American Fletcher National Bank and Trust Company. *Id.* ¶ 35; Dkt. No. 1-1, Last Will & Testament of Eli

Lilly ("Lilly Will"), at 10. At the time the Trusts were created, banks had separate trust departments that were conservative and were required to adhere to very strict guidelines for management of a trust. Compl. ¶¶ 38-39. The Lilly Will directed each trustee to invest and reinvest property and to regularly distribute income to the church for the purpose of allowing the Church to carry out its religious, charitable and educational purposes. Dkt. No. 1-1, Lilly Will at 11.

> The Lilly Will further provided:
>
> The Trustee shall at all times have the right to . . . deal with any and all of the securities and other property, personal or real, with the same freedom that an absolute owner of such securities or property would have, all without any authorizing or confirming order or orders of court or notice or other formalities and without the consent of the beneficiary of the trust and notwithstanding any provisions of the laws or regulations of any state or of the United States of America, statutory or otherwise, in that respect.

*Id.* Item IX, Clause 5(d), at 12. And, the Lilly Will provided:

> The Trustee is specifically authorized to hold and retain and to invest and reinvest the property of the trust in such securities, including the stock of the Trustee Bank, or the stock of any other corporation owning the stock of said Bank, or other real or personal property, including common and preferred stocks and investment trusts, as the Trustee shall determine, without the consent of any beneficiary and without any authorizing order of court, notwithstanding any regulation, statutory or otherwise, respecting legal investments of trust funds.

*Id.*, Item IX, Clause 5(c), at 12. The Church understood "that it had no legal right or authority to make investment decisions on behalf of the Trusts, and it could not terminate [a] trusteeship." Compl. ¶ 82.

Moreover, the Lilly Will stated that "the Trustee shall not be liable for any losses which may be sustained or shrinkages in value which may occur in the administration of the trust except in the event of a willful breach of trust." *Id.*, Item IX, Clause 5(a) at 12.

3

Through a series of mergers, by July 1999, Bank One Trust Company N.A. ("Bank One") had become Trustee of two of the Trusts, which are the Trusts at issue herein. Dkt. No. 1-2, Order Granting Joint Petition for Instruction as to Construction of Trust Instrument ("Trust Order"), at 1. Although as originally written the Trusts provided for distributions only of income to the Church, in July 1999, the Marion County Probate Court modified the Trusts to permit the Church to receive distributions of "realized and unrealized net appreciation in value of the Trusts' assets, as well as from income." Dkt. No. 1-2, Trust Order at 2. In accordance with the Trust Order, the Church became entitled to receive annual distributions equal to 5% of the aggregate value of the Trusts' assets. *Id.* The amount increased to 6% in years in which the Standard & Poor's 500 Index or the Consumer Price Index for All Urban Consumers showed that the economy had underperformed. *Id.* at 3.

Although the Church had no investment decision making authority, it monitored the Trusts' assets closely and constantly. The Church's Investment Committee reviewed the Trusts' asset allocations and performance. Compl. ¶ 71. The Church assessed the Trusts' performance in comparison to what the Church considered appropriate benchmarks. *Id.* The Church also employed "independent experts and consultants" in addition to its Investment Committee to "advise [it] on the investments." *Id.* ¶¶ 74-76, 97.

In July 2004, Chase became the successor trustee of the Trusts when it merged with Bank One. Compl. ¶ 77. During the period between July 2004 and late 2007, Chase made very few changes to the investment portfolio of the Trusts, which consisted largely of equities and bonds. *Id.* ¶¶ 77-80.

4

On September 17, 2007, Chase representatives met with the Church to introduce it to certain financial products that Chase intended to purchase for the Trusts and opined about the significant opportunities to invest in structured notes, derivatives, and hedge funds. *Id.* ¶¶ 92-96. Between September 2007 and December 2013, Chase created, offered, sold to, and purchased for the Trusts: (a) eighty-eight structured notes where Chase[1] was the sole placement agent; (b) nine off-shore hedge funds all created by Chase; (c) two Chase created off-shore private equity funds committing $1 million of Trust funds; (d) two losing hedge funds sold by a Chase acquired subsidiary, Highbridge Capital Management; and (e) twenty-five other Chase proprietary mutual funds including funds that not only caused the Trust to lose a substantial amount of money but were dissolved based upon their poor performance and Chase's inability to sell them to non-captive intelligent investors. *Id.* ¶¶ 10-23.

Indeed, the Church alleges that Chase's selection of certain investments "[o]ver the last few months of 2007 . . . made little sense to the Church's Investment Committee," and that "[t]he portfolio was unnecessarily over-diversified, illogical, and not consistent with a coordinated investment strategy." *Id.* ¶¶ 109-110. Further, the Church "was concerned over the bank's objectivity" in 2008 as Chase invested the Trusts' assets in hedge funds, structured notes, and "JPMorgan proprietary funds" that the Church felt were "higher-fee funds." *Id.* ¶ 112. The Church claims that Chase and Parent, as well as other Parent subsidiaries profited from the sale of these financial products to the Trusts. *Id.* ¶¶ 45, 125, 207-14.

---

[1] From this point forward in the allegations, references to "Chase" refer to the Church's usage of "JPMorgan" in the Complaint, which it defines to include Defendants "and multiple JPMorgan subsidiaries and affiliates."

The Church also asserts that Chase designed a plan to encourage its employees to steer clients to Chase proprietary products manufactured and created by Chase. *Id.* at 187-92. Specifically, Chase allegedly pressured its sales advisors to sell the products and created scorecards that it provided to investment sales staff highlighting the financial products they should guide their clients to purchase. *Id.* at 192-99. This plan was concealed from the Church. *Id.* at 200.

The Church avers that the 88 structured notes sold to the Trusts were impossible to understand or monitor, not transparent, not marketable, high risk and have been the subject of warnings issued by the Securities and Exchange Commission ("SEC"). *Id.* at 100-03, 201-05. Further, according to the Church these structured notes are often subject to retrocession agreements (i.e. kick-backs from the issuers to the placement agent such as Chase). *Id.* at 104-07.

With respect to the nine hedge funds that Chase bought in the Trusts, Chase itself created each off-shore fund or funds of funds that was managed and administered by JPMorgan Private Investments, Inc. *Id.* ¶¶ 112-25. Unbeknownst to the Church, JPMorgan Securities LLC was a "special limited partner" in some of the funds. *Id.* ¶ 123.

Around 2004, Chase purchased the majority interest in Highbridge Capital Management; it owned the entire company by 2009. *Id.* ¶¶ 215-17. According to the Complaint, it turned out to be a bad investment for Chase and Chase's trust clients. *Id.* ¶ 219. Independent investors were selling off their interests because of poor performance, but allegedly Chase kept some of the funds alive by "forcing its clients" to purchase them. *Id.* ¶¶ 218-19. The Church avers that $1.844 million of the Trusts' monies were tied up in two Highbridge funds for 2.5 years during which time the Trust lost $95,000.00 in

principal.  *Id.* ¶¶ 221-23.  The Church alleges that multiple proprietary mutual funds purchased in the Trusts were doomed for failure as well and led to losses of $781,000.00 from three funds that were ultimately dissolved.  *Id.* ¶¶ 111, 207-14.

The Church also asserts that "[b]y the end of 2008, the Trusts' portfolio had decreased to $26.9 million from $39.2 million in December 2007, a loss in value of $13.5 million while [Chase's] disclosed annual fee had doubled in size."  *Id.* ¶ 125.  However, by the Church's own calculations, the principle value of the Trusts increased from $26,693,524.08 at the end of 2008 to $31,657,324.17 by the end of 2013, an increase of almost $5 million over and above the millions that the Church received in distributions during the period.  Dkt. No. 1-3, Total Estimated Year-End Values.

In 2011 and 2012, the Church questioned Chase about the total revenues it was receiving from the investment products in the Trusts' portfolio including revenues received by any Chase entity.  Compl. ¶ 152.  The Church received limited explanations of fees and carefully worded explanations relating only to a portion of the fees and costs received by Chase alone, not other JPMorgan entities.  *Id.* ¶¶ 18, 152-54.

In January and February 2012, Chase sold two private equity fund financial products to the Trusts, committing $1 million in two high-risk, high-cost, illiquid private equity conduit funds created by Chase that obligate the Trusts to continue to pay monies to the funds until at least 2023.  *Id.* ¶ 155.  The Church claims that Chase concealed significant information from it relating to these two products including offering memoranda and the subscription agreements.  *Id.* ¶¶ 163, 166, 169.  On March 8, 2012, Chase sent a letter to the Church that welcomed the Church as an investor in "KKR NS XI Private Investments, Inc." ("KKR").  *Id.* ¶ 162; Dkt. No. 1-6, KKR Welcome Letter.  The signature

7

page of the subscription agreement was the only page attached to the letter. *Id.* The Church alleges that the agreement binds the Church Trusts to a $500,000.00 commitment and additional substantial fees that would be paid to Chase until 2023. Dkt. No. 106, KKR Welcome Letter.

The signature page of the subscription agreement identifies "Matthew Crenshaw, Portfolio Manager" as the signatory on behalf of the "Limited Partner (Investor)," the Trusts. Compl. ¶ 165. The Church asserts that the signature appears to be computer-generated. *Id.* ¶ 164. By signing, Crenshaw claimed that the Trusts had read and understood the subscription agreement and its multiple warnings. *Id.* ¶ 165. Further, the signature page represents, "The undersigned is not an employee or director of J.P. Morgan or the spouse, domestic partner, minor child and/or financial dependent of an employee of director (a 'Related Person')." Dkt. No. 1-6, KKR Welcome Letter, at 2. The signatory on behalf of KKR was the Vice President of Global Funds Structuring, "J.P. Morgan Private Investments Inc." as administrator. *Id.*

According to the Church, Chase reported that from 2004 through 2013, its net revenues increased from $43 to $96.6 billion and its assets grew $1.4 trillion in additional value. *Id.* ¶ 21. According to a 2014 corporate overview to shareholders, Chase earned $1.1 billion in revenues from cross-selling its proprietary products to its clients. *Id.* ¶ 22. According to the Complaint, Chase made more money on some financial products sold to the Trusts than did the Trusts. *Id.* ¶¶ 19, 205, 214, 223.

## III. **DISCUSSION**

### A. CONSTRUCTIVE FRAUD

Defendants argue that the Church has failed to plead its constructive fraud claim with the particularity required by Rule 9(b) and should be dismissed. Dkt. No. 16, at 22-29.[2] Specifically, the Complaint generically refers to "JPMorgan" or a "JPMorgan representative" making statements without identifying either the specific entity or a particular person who made the representation. *Id.* at 24. Similarly, the Complaint also alleges that statements were made to the "Church" or the "Investment Committee" without specifically identifying the recipient of the information. *Id.* Defendants also aver that the Complaint does not allege that any statements made to the Church were false or misleading or that the unidentified speakers did not believe that their statements were true or did not intend to take actions consistent with the statements. *Id.* at 24-25; Dkt. No. 30 at 18-20. Further, Defendants contend that the Church concedes in the Complaint that it had no legal right or authority to make investment decisions on behalf of the Trusts and could not terminate the trusteeship, which forecloses any argument that the Church relied on the Trustee to make investment decisions. Dkt. No. 30 at 14-20.

In response, the Church outlines its investigation of the alleged activities of the Trustee, asserting that the documents reveal that the Parent required local representatives to use scorecards and lists to make investment decisions rather than analysis. Dkt. No. 26 at 18-19. Further, the investigation revealed that Chase was under investigation by the SEC and the Office of the Comptroller of Currency ("OCC") for

---

[2] All page numbers refer to the ECF page number in the upper right-hand corner of the referenced document.

steering clients to JPMorgan proprietary products and that the practice was criticized by others in the industry.  *Id.* at 19-20. In addition, the Parent's annual reports for 2004 through 2014 revealed that its revenues for cross-selling of its own proprietary products made up for losses of revenue in its traditional banking business.  *Id.* at 20.  The Church claims it asked for, but never received, information regarding any risk analysis, audits and suitability reviews of financial products sold to the Trusts.  *Id.* at 20.

The Church contends that it has sufficiently alleged the existence of a fiduciary relationship and a scheme to defraud; therefore, reliance is presumed as a matter of law. *Id.*  Further, the Church relied upon and was entitled to rely upon the Trustee and did so to its detriment because Chase's scheme "spanned multiple years involving a complicated transfer of wealth from the Church Trusts to [Chase]."  *Id.  See also id.* at 21 (discussing the fiduciary relationship and presumption of fraud); *id.* at 22 (discussing presumed reliance).  The Church claims that Chase, "as Trustee, advised the Church that it fully understood its legal duties to act in the Church's best interests."  Complaint ¶¶ 86-87.  "At no time[] did JPMorgan advise the [C]hurch of its massive scheme to defraud which is set forth in great detail through the Complaint."  Dkt. No. 26 at 22.  Finally, the Church asserts that the law recognizes that a beneficiary is entitled to and must rely upon a trustee; therefore, it can state a claim for constructive fraud.  *Id.* at 22-23 (citing *Wilbur v. Keybank Nat'l Ass'n*, 962 F. Supp. 1122, 1129 (N.D. Ind. 1997); *Malachowski v. Bank One*, 570 N.E.2d 65, 69 (Ind. Ct. App. 1991)).

To prove constructive fraud, the Church must show the existence of a duty owed by each of the Defendants to the Church because of their relationship, and that each of the Defendants gained an advantage. *See Morfin v. Estate of Martinez*, 831 N.E.2d 791,

802 (Ind. Ct. App. 2005). The duty may be shown by some fiduciary relationship. *Id.* If the Church evidences those two elements by a preponderance of the evidence, then a presumption of fraud arises regarding the challenged transactions. *Id.* Defendants may overcome that presumption by showing by clear and unequivocal evidence one of the following: (1) that it made no deceptive material misrepresentations of past or existing fact or did not remain silent when a duty to speak existed; or (2) the Church did not rely on any such misrepresentation or silence; or (3) no injury proximately resulted from the misrepresentation or silence. *Id.*

The Court concludes that the Church has not stated its constructive fraud claim with enough particularity. At the outset of the Complaint, the Church recites the relationship between the Parent and Chase, but then lumps together both entities as well as any other Parent-related entity. Compl. ¶ 6. This is problematic because there is no allegation that the Court should pierce the corporate veil and treat any and all Parent-related entity as the Parent itself or vis-a-versa. Further, it is unclear in the Complaint if the "JPMorgan employee" or "JPMorgan employees" who met with "Church representatives" at various times owed a fiduciary duty to the Church. In addition, there are specific allegations of potential mismanagement, however, there are no specifics as to the "who," which is the only way that the Court or Defendants can ascertain whether there is a factual basis for the "duty owed" element of the constructive fraud claim. *See*, *e.g.*, Compl. ¶¶ 128-31. Similarly, because the Church lumped Defendants together and with other subsidiaries of Parent, there is no way to ascertain which entity reaped any benefits from the alleged misrepresentations and/or omissions.

11

Also missing are facts related to what decisions the Church made in reliance on any alleged misrepresentation or material missing information that proximately resulted in some injury to the Church. The Church admits that it had no investment authority over the Trusts' assets and could not take steps to terminate the trusteeship. Compl. ¶ 82. However, the Complaint suggests that no JPMorgan entity manages the Trusts today, *id.* ¶¶ 173 & 176; therefore, there might be facts to support the reliance element, but they must be plead with more particularity.

For these reasons, the Court **GRANTS** Defendants' Motion to Dismiss the Constructive Fraud claim **WITHOUT PREJUDICE**.

### B. <u>INDIANA SECURITIES ACT CLAIM</u>

Defendants assert that the Complaint fails to state a claim under the ISA because it fails to plead with the particularity required by Rule 9(b), Dkt. No. 16, at 22-29; and because the Church admits that it had no authority over investment decisions. *Id.* at 17-21. With respect to the Rule 9(b) requirement, Defendants argue that there are no specific allegations of the who, when, when, where, why or how of the alleged fraud. *Id.* at 24-25. Also with respect the Rule 9(b) requirement, Defendants claim that the Complaint fails to explain how any allegedly omitted information rendered the information that the Trustees provide to the Church misleading. *Id.* at 26-29. With respect to the Church's lack of authority to make purchases, Defendants argue that such an admission bars the Church's securities fraud claim because only purchasers and sellers of securities are entitled to maintain actions for violation of securities law. *Id.* at 17-21.

The Church argues that "JPMorgan" was the offeror, the seller and the purchaser of securities in the Trusts that "it created as a part of its scheme and artifice to defraud

12

for the purpose of surreptitiously transferring wealth from [the Church] to JPMorgan." Dkt. No. 26, at 24. The Church claims that such self-dealing is a defacto violation because a trustee may not "unite the two opposite characters of buyer and seller." *Id.* (citing *Terre Haute Trust Co. v. Scott*, 181 N.E. 369, 374 (Ind. Ct. App. 1932), *en banc*). The Church asserts that it has standing under the ISA because it has a beneficial interest in the Trusts and because its money was used to make the allegedly fraudulent transfers. *Id.* at 25-28.

The ISA states, in relevant parts:

It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly:

    (1) to employ a device, scheme or artifice to defraud;

    (2) to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; or

    (3) to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

Ind. Code § 23-19-5-1. Further, the civil liability portion of the ISA provides:

(a) . . . a person is liable to the purchaser if the person sells a security in violation of this article . . . .

    (1) The purchaser may maintain an action to recover the consideration paid for the security, less the amount of the income received on the security and interest . . . , costs, and reasonable attorney's fees determined by the court or arbitrator. . . or for actual damages . . . .

(b) . . . a person is liable to the seller if the person buys a security in violation of this article . . . .

    (1) The seller may maintain an action to recover the security, and any income received on the security, costs, and reasonable attorney's fees determined by the court or arbitrator, . . . or for actual damages . . . .

13

Ind. Code § 23-19-5-9.

The Court agrees with Defendants that there is no critical difference between federal securities statutes and the ISA with respect to the seller/purchaser requirements. First, the Indiana Supreme Court has declared that the ISA "requires either privity between the seller and purchaser, or that the person charged have offered the security to the purchaser." *Kirchoff v. Selby*, 703 N.E.2d 644, 650 (Ind. 1998). In other words, the parties to a securities transaction have a cause of action. According to the admissions by the Church in the Complaint, it is not a party to any of the allegedly fraudulent transactions because it cannot make any investment decision with respect to the Trusts. Compl. ¶ 82.

Further, the Indiana Supreme Court has suggested that reliance on cases interpreting federal securities law may be helpful to interpret the ISA where the language is similar. *Lean v. Reed*, 876 N.E.2d 1104, 1108-09 (Ind. 2007). The anti-fraud provision of the federal statute, 15 U.S.C. § 78j (commonly known as "§ 10b"), like that in Indiana, uses "in connection with" language to describe prohibited behavior. *Compare* Ind. Code § 23-19-5-1 *with* 15 U.S.C. § 78j. In interpreting the "in conjunction with" language of § 10b, the Seventh Circuit has long held that only a buyer or seller of the securities has a cause of action. *See O'Brien v. Continental Ill. Nat'l Bank & Trust*, 593 F.2d 54, 59-63 (7th Cir. 1979). An entity like a beneficiary that does not have investment decision-making authority cannot bring a claim under the anti-fraud provision of the federal securities laws because the purpose of the federal securities regulations is to ensure full disclosure with respect to transactions; it is not to protect those who have entrusted such decision making

14

to others.  *Id.* at 60.  According to the *O'Brien* court, a breach of fiduciary duty or breach of contract claim is the proper avenue to pursue redress in such cases.  *Id.* at 63.

Applying this analysis to the ISA, the language of the remedy provision taken in conjunction with that of the anti-fraud provision evidences that it the legislation is directed to buyers and sellers, not beneficiaries that are strangers to the decision of whether to buy or sell.  The remedy provision is specific as to when a buyer or a seller may recover; never once does it mention a person with a non-decision making beneficial interest.  Ind. Code § 23-19-5-9.  Further, the anti-fraud provision prohibits misrepresentations of information and other fraudulent activity "in conjunction with" a transaction, which necessarily would include an offer, a seller and an investor.  Ind. Code § 23-19-5-1.  The Church cannot allege that it was involved in any transaction in any way because it admits it has no investment authority with respect to the Trusts; therefore, it cannot state a cause of action under Indiana Code § 23-19-5-1.

For these reasons, the Court **GRANTS** Defendants' Motion to Dismiss Count II of the Complaint brought pursuant to the ISA; Count II is **DISMISSED WITH PREJUDICE**.

### C.  CLAIMS AGAINST PARENT

As set forth in Section III.A. above, the Church has lumped multiple entities together in the Complaint as to nearly all allegations.  Because it is impossible to tell which entity owes any duty to the Church and which entity was specifically involved in alleged self-dealing or made misrepresentations or omission, Parent's motion to dismiss on that alternative ground is **GRANTED**, but **WITHOUT PREJUDICE**.

## IV. CONCLUSION

For the reasons stated herein, the Court **GRANTS** Defendants JPMorgan Chase and Company's and JPMorgan Chase Bank, N.A.'s, Motion to Dismiss, with leave to re-plead certain Counts: **Count I** is **DISMISSED WITHOUT PREJUDICE as to both Defendants, with leave to re-plead**; **Count II** is **DISMISSED WITHOUT PREJUDICE as to JPMorgan Chase and Company only, with leave to re-plead**; **Count III** is **DISMISSED WITH PREJUDICE**. Plaintiffs, The Rector, Wardens and Vestrymen of Christ Church Cathedral of Indianapolis, have 28 days from the date of this Order to file an Amended Complaint. Partial judgment shall not issue at this time.

IT IS SO ORDERED this 21st day of May, 2015.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

David K. Herzog
FAEGRE BAKER DANIELS LLP - Indianapolis
david.herzog@faegrebd.com

Katrina Michelle Gossett
FAEGRE BAKER DANIELS LLP - Indianapolis
katrina.gossett@faegrebd.com

Paul A. Wolfla
FAEGRE BAKER DANIELS LLP - Indianapolis
paul.wolfla@faegrebd.com

Sarah Jenkins
FAEGRE BAKER DANIELS LLP - Indianapolis
sarah.jenkins@FaegreBD.com

David J. Hensel
PENCE HENSEL LLC
dhensel@pencehensel.com

Julie L. Smith
PENCE HENSEL LLC
jsmith@pencehensel.com

Linda L. Pence
PENCE HENSEL LLC
lpence@pencehensel.com